W. E. ELMORE v. MRS. FREIDA M. THOMPSON et al.

Middle Section.   July 2, 1931.

Petition for Certiorari denied by Supreme Court, January 23, 1932.

David Keeble, Wm. M. Greene and Sydney F. Keeble, all of Nashville, for plaintiff in error.

Wm. N. McKinney and Aust, Cornelius & Wade, all of Nashville, for defendant in error.

FAW, P. J. W. E. Elmore sued Mrs. Freida M. Thompson and Robert L. Marshall, Jr., in the Circuit Court of Davidson County, to recover damages for personal injuries suffered by plaintiff. Plaintiff averred that on or about October 31, 1929, he was crossing from the Eastern side of Tenth Street South, in the City of Nashville, Davidson County, Tennessee, in order to reach his home directly across, on the opposite side of, the Street, when he was struck by the automobile owned by the defendant Robert L. Marshall, Jr., bearing Tennessee State license tag No. 27400, registered in the name of Robert L. Marshall, Jr., and driven by Mrs. Freida M. Thompson, while the said automobile was traveling southwardly on Tenth Street South, inflicting on plaintiff serious and permanent personal in-

juries; and there was evidence introduced below from which the jury could have found that these averments were true.

The case went to trial before a jury in the Third Circuit Court of Davidson County, on the issues made by the defendants' plea of not guilty to the plaintiff's declaration, and, at the close of the plaintiff's evidence, the trial judge, on motion of defendants, peremptorily directed the jury to return a verdict in favor of defendants, which was done, and the suit was dismissed at the cost of the plaintiff.

The plaintiff has brought the case to this Court by an appeal in the nature of a writ of error, and is here insisting, through assignments of error, brief, and oral argument of his counsel at the bar, that the trial court erred in directing the jury to return a verdict in favor of the defendants. Learned counsel for plaintiff say that the trial court erred because (1) the plaintiff had established, by the proof introduced before the jury, a prima facie case of liability against the defendants, and the Court, in effect, passed upon the weight of the evidence in directing a verdict; (2) under the proof introduced in the case, the direction of a verdict for the defendants was an invasion of the province of the jury; and (3) in refusing to permit a jury to pass upon the case the Court failed to give the plaintiff the benefit of the most favorable inferences deducible from the whole evidence.

If, as asserted on behalf of plaintiff Elmore, the trial Court invaded the province of the jury by passing upon the weight of the evidence, or failed to give the plaintiff the benefit of the most favorable inferences deducible from the whole evidence, the judgment must be reversed and the cause remanded; for there can be no constitutional exercise of the power to direct a verdict in any case where there is dispute as to any material evidence, or any legal doubt as to the conclusion to be drawn from the whole evidence upon the issues to be tried, but the case must go to the jury. Tyrus v. Railroad, 114 Tenn., 579, 594, 86 S. W., 1074; T. C. Railroad Co. v. Morgan, 132 Tenn., 1, 5, 175 S. W., 1148; Hines v. Partridge, 144 Tenn., 219, 232, 231 S. W., 16; Wildman Mfg. Co. v. Davenport Hosiery Mills, 147 Tenn., 551, 556, 249 S. W. 984; Klein v. York, 149 Tenn., 81, 85, 257 S. W. 861; Stanley Bird Motor Co. v. Alley, 1 Tenn. App. R., 202, 206; Wylie v. Green River Lumber Co., 8 Tenn. App. R., 373, 379; Mayor & Aldermen of Knoxville v. Cain, 128 Tenn., 250, 252, 159 S. W., 1084.

The plaintiff's declaration contains three counts. In the first count, after the averments hereinbefore stated and a description of the plaintiff's injuries (which, according to the averments and the proof, were serious, painful, and in some respects permanent), the plaintiff alleged that "the defendant Mrs. Freida M. Thompson in

operating her said automobile, injuring him in the manner aforesaid, was driving the same in a careless, negligent, reckless, and wrongful manner, and that such reckless and negligent driving proximately caused the injuries inflicted upon plaintiff, to his great detriment and damage, causing him great mental anguish and affliction, and great physical pain, suffering and impairment, and large expense, all as aforesaid.''

In the second count of the declaration, it is alleged that plaintiff violated certain specified provisions of Chapter 87 of the Public Acts of 1929 regulating the operation of vehicles upon the streets and highways of Tennessee, and was thereby guilty of negligence per se which proximately caused plaintiff's injuries. But actionable negligence cannot be predicated upon a violation of the aforesaid Act of 1929, Ch. 87, for the reason that the Supreme Court, speaking through Mr. Justice Chambliss, in the case of Godsey v. State, decided at Nashville on June 9, 1931, held said Act wholly void and of no effect, because in contravention of Sec. 17 of Art. 2 of the Constitution, in that, the body of the Act contains a subject not expressed in its title. It is therefore unnecessary to further consider the second count of the declaration.

Through the third count of his declaration, the plaintiff alleges that the aforesaid injuries to plaintiff were inflicted upon a public street in the City of Nashville, a municipal corporation, and that defendant Mrs. Thompson was driving her automobile in violation of certain ordinances of the City of Nashville enacted for the purpose of regulating the operation of automobiles upon the streets of said City; and the ''pertinent provisions'' of said ordinances are set out in the third count of the declaration.

There is evidence in the record tending to prove that the driver of defendants' automobile violated three of the ordinances of the City of Nashville set forth in the third count of the declaration, as follows:

(1) That ''a vehicle, except when passing a vehicle ahead, shall keep as near the right hand curb as possible;''

(2) That ''it shall be unlawful for any vehicle to exceed a speed of thirty miles per hour within the corporate limits of said City;'' and

(3) That ''it is unlawful for any person to drive a vehicle upon a highway, street, alley, or other thoroughfare of said City, . . . without due caution and circumspection and at a speed or in a manner so as to endanger property and any person so operating a vehicle shall be deemed guilty of reckless driving.''

We find no evidence to justify consideration of other ordinances mentioned in the declaration.

Although it is not universally so held, it is well settled in this State (and by the numerical weight of authority in other jurisdic-

tions), that an automobile is not, in law, an inherently dangerous instrumentality, and a driver is bound to exercise only ordinary care in its operation, or that degree of care or caution which an ordinarily careful and prudent person would exercise under the same circumstances. Leach v. Asman, 130 Tenn., 510, 513, 172 S. W., 303; Studer v. Plumlee, 130 Tenn., 517, 519, 172 S. W., 305; Core v. Resha, 140 Tenn., 408, 412, 204 S. W., 1149; Taylor v. Arnold, 2 Tenn. App. R., 246, 251. Hence, the doctrine of res ipsa loquitur can have no application to this case, and the mere fact that defendants' automobile struck and injured plaintiff does not raise a presumption of negligence. DeGlopper v. Railway & Light Co., 123 Tenn., 633, 643, 646, 134 S. W., 609; Memphis Street Railway Co. v. Cavell, 135 Tenn., 462, 467, 187 S. W., 179. And in such cases the rule that the duty devolves on the defendant to introduce proof to rebut any unfavorable inferences which might be deduced from facts in evidence does not apply unless the plaintiff's proof and the legal deductions therefrom make a prima facie case of liability against the defendant. Davis v. Auto Tire & Vulcanizing Co., 141 Tenn., 527, 529, 213 S. W., 914.

Conjecture cannot take the place of proof in making out plaintiff's claim of liability against defendants; but the essential facts of plaintiff's case may be proven by circumstances. And if diverse inferences as to material matters may be reasonably drawn from the evidence, the case cannot be decided by the Court, but must go to the jury. Nashville Railway & Light Co. v. Harrison, 5 Tenn. App. R., 22, 34; Adamant Stone & Roofing Co. v. Vaughn, 7 Tenn. App. R., 170, 178; W. U. Telegraph Co. v. Lamb, 140 Tenn., 107, 110-111, 203 S. W., 752; Johnston v. Railway Co., 146 Tenn., 135, 149, 240 S. W., 295; Nashville Railway & Light Co. v. Williams, 11 Tenn. App. R., 1, 6.

In the view we take of the record, the determinative questions in this case are as follows;

(1) Is there any evidence that defendant Mrs. Thompson was violating the aforesaid two ordinances, or either of them, regulating and limiting the speed of vehicles on the streets of the City of Nashville?

(2) Is there any evidence that defendant Mrs. Thompson was violating the said city ordinance which requires that "a vehicle, except when passing a vehicle ahead, shall keep as near the right hand curb as possible?"

(3) Does the evidence, with all reasonable inferences favorable to the plaintiff which may be drawn therefrom, show, without contradiction, that the plaintiff was negligent, and that his negligence proximately caused, or contributed to, the injuries which he received?

If the last stated of these three questions be answered in the affirmative, the first and second questions become immaterial or non-determinative (Traction Co. v. Brown, 115 Tenn., 323, 331-2, 89 S. W., 319), and the trial court did not err in directing a verdict for the defendants.

The learned trial judge stated, as his reasons for sustaining defendants' motion for peremptory instructions, that the plaintiff had not made out a case, and that under the proof the plaintiff was guilty of contributory negligence; from which statements we infer that the trial judge was of the opinion that there was no evidence upon which the jury could base a finding that the defendants were guilty of negligence in any of the respects charged in the declaration, and that His Honor was further of the opinion that negligence of the plaintiff was the proximate cause of his injuries.

The ground on which the trial judge predicated his opinion that the plaintiff was guilty of negligence is indicated by a statement made by him, and addressed to one of plaintiff's attorneys, at the close of the argument of defendants' motion for peremptory instructions, which statement of the Court was as follows: ''I just can't see well, Mr. Greene, how anybody could step right off the pavement into the line of traffic of an automobile without being guilty of negligence; I just can't see how he can.''

In order to test the soundness of the rulings of the trial court, it is necessary to examine the evidence.

The plaintiff was injured under the circumstances stated in his testimony (which we shall presently quote) shortly after nightfall on October 31, 1929. He was thirty-three years of age at that time and, so far as appears, not suffering from any physical or mental disability or infirmity. He was employed in an automobile service station near the corner of Seventh Avenue and Commerce Street in the City of Nashville, and his home was at 210 South Tenth Street, Nashville, which was on the West side of South Tenth Street and approximately, though not exactly, in the center of the Block between Russell Street on the north and Fatherland Street on the South.

A few minutes after six o'clock P. M., on the date before named, plaintiff alighted from an automobile (in which he had ridden from his place of business) at a point on the East side of South Tenth Street, nearly opposite his home, and in front of the home of one Bowman which was situated on the East side of the street and immediately south of the home of one Oglesby (or Ogilvie). The automobile from which plaintiff had alighted then drove away and, so far as the record shows, there were no other automobiles in the vicinity of plaintiff until the arrival of the car driven by defendant Mrs. Thompson, which, plaintiff alleges, struck and injured him.

The only evidence in the record with respect to the movements of plaintiff from the time he alighted from an automobile in front of Bowman's home as before stated until he was found lying in the street, in an unconscious condition, a few feet behind a standing automobile, is the testimony of plaintiff himself, which we quote as follows:

"Q. And that house I will mark that with a cross-mark, then which way did you go, or what did you do when you got out? A. Well, when I got out of the car, Mr. Oglesby's little child said, Hello, Mr. Elmore.

"Q. Where was the child? A. She was standing on his steps, on his walk, right on the steps, on the walk that goes up to the house.

"Q. Now, when she said that, what did you do? A. I just walked down to where she was, down the pavement, down the sidewalk, down to where she was.

"Q. Where, down this way? A. Facing north, yes sir.

"Q. Now you knew that little girl, didn't you? A. Yes sir.

"Q. And had known her for some time? A. Yes sir.

"Q. And on the night of the thirty-first of October, that was Halloween night, wasn't it? A. Yes sir.

"Q. Just go ahead and describe to this jury what you did. A. When I got out of the car, she said, Hello, Mr. Elmore, and I walked down that way and noticed she had a mask on her face, one that covered her eyes, I walked down there and stood there for a few minutes, said a few words to her.

"Q. Now, when you were talking to the child, Mr. Elmore, state to the jury which way you were facing, and which way you were facing as you said this— A. I was facing north.

"Q. Down toward Russell Street? A. Yes sir.

"Q. Now, in this connection, can you give the jury any idea of the distance from this point where you were talking to the child to Russell Street? A. You know Russell has a little off-set in it there, the part that is running east is something like two hundred feet or more, and down to the other part of Russell Street, I would think is 240 feet, something like that.

"Q. Down here where it sets off it sets off farther this way? A. Yes sir, farther north.

"Q. And then this way, of course, would be shorter, as I understand you were facing that direction when you were talking to the child? A. Yes sir.

"Q. What was the extent of your conversation with the child, I mean the length of it? A. Oh, I just said a few words, not over a minute and a half, something like that.

"Q. Then, what did you intend to do after you talked to the child? A. Well, I was going to cross over to my home.

"Q. This is your home over here? A. Yes sir.

"Q. Well, which way did you turn when you were going across? A. I just turned around, I was facing north, I just turned around and started to cross the street, and looked to my left, and stepped off the curb, and I was in the act of taking my second step, and that is the last I remember.

"Q. As I understand you, when you finished your conversation with the child you turned to go over to your home, intending to go to your home? A. Yes sir.

"Q. And as you took a step off the curbing you looked south toward Fatherland Street? A. Yes sir.

"Q. Where an automobile might be expected to come on the right side of the street, is that correct? A. Yes sir.

"Q. And as you undertook to take your next step, then tell the jury what happened? A. Well, I never did—of course when I started to take my second step, in the act of looking to my right, that is the last I remember.

"Q. I see, you don't have any recollection after that, do you? A. No sir.

"Q. Of what happened to you? A. No sir.

"Q. Where did you find yourself? A. In the hospital.

"Q. Do you know about what time it was that you knew anything that night? A. Well, I can't say that I remember anything that night for sure, but I remember being in the X-ray room the next morning.

"Q. You didn't know, you are not personally acquainted with the defendant, Mrs. Thompson, are you, Mr. Elmore? A. No sir.

"Q. You don't know whether she was the person driving the car or not, yourself? A. No sir.

"Q. You also are not acquainted with Mr. Marshall, are you? A. No sir. . . .

"Q. Did you see any lights from a car when you were there talking to that little girl just before you turned and stepped off the sidewalk? A. No sir.

"Q. Did you see anything at all that would indicate that an automobile was coming? A. No sir, I did not.

"Q. Did you hear any horn? A. No sir.

"Q. Did you hear a signal of any kind? A. I did not.

"Q. How long have you been working with automobiles? A. It is almost four years, will be four years in February.

"Q. How long have you been driving automobiles? A. I have been driving automobiles—

"Q. Approximately? A. Since 1916 I know.

"Q. Fourteen or fifteen years. . . .

"Q. If the distance from where you were talking to the little girl up to Russell Street is about two hundred feet or so, would you have been able to discern an automobile there? A. Yes sir.

"Q. Was your sight good at that time? A. Yes sir.

"Q. You don't know where you were found in the street of course, but did you ever go back to the street when you got back home and examine the street? A. Yes sir.

"Q. Did you find anything in the street that would indicate where you had lain? A. They showed me a place where there was a puddle of blood.

"Q. Where there was what? A. A puddle of blood.

"Q. A puddle of blood, where was that in the street? A. It was along about middleways of the street.

"Q. I have drawn a dotted line, an imaginary line that would indicate the middle of the street; do you know whether or not there is a telephone pole just north of your house up toward Fatherland Street? A. There is one just south of the house.

"Q. I mean just south of the house? A. Yes sir.

"Q. And then do you state with reference to any part of the sidewalk over there if a line were drawn straight out in the street where that blood was found? A. Well, it was right straight across from a little grassy place, I don't know whether it was just exactly straight or not, but it was from a little grassy place they said they laid me out, laid me up on the sidewalk.

"Q. I am indicating with the word 'pole' that little circle indicating the telegraph pole, and this little square as the grass plot; then the puddle of blood was somewhere out here, was it? A. Yes sir.

"Q. Near the middle of the street, or in the middle of the street? A. Yes sir.

"Q. Did you know which side of the middle line it was on if it was on either side? A. I don't recall no more than it was about the center of the street. . . .

"Q. Now, Mr. Elmore, do you know the width of this street, A. It is about twenty-six feet.

"Q. From curbing to curbing? A. Yes sir.

"Q. Twenty-six feet across—now, do you know where this telephone pole is with respect to the side line of your lot, where you live? A. The telephone pole is about on the, as well as I remember, it is about the line between my house and Mr. May.

"Q. Dividing those lots? A. Something like twelve feet.

"Q. Twelve feet, now have you measured, or can you give the jury an approximate idea, if you were struck in the street

here, or some point hereabout, intending to go over to your home, from that point to this pool of blood, that bloody place there in the street, can you give the jury some idea of the distance? A. Approximately forty-five feet.''

We also quote from the cross-examination of plaintiff as follows:

"Q. And when you stepped out in the street, I believe you say you looked back toward Fatherland Street, to your left? A. I did.

"Q. I will ask you if you ever did look to your right? A. Yes, looked to my right before I started to step across.

"Q. But after you got in the street, did you ever look to your right? A. I was in the act of looking to the right, that was the last I did.

"Q. What do you mean by in the act of looking to your right? A. Any one crossing the street generally looks to their left if they are on the right side of the sidewalk and going out that way.

"Q. I am not talking about what people generally do; you told Mr. Green you were taking that step and look to your left? A. That is all I remember.

"Q. Had you looked to your right? A. I had already looked to my left.

"Q. But you hadn't looked to your right? A. I was in the act of looking to my right.

"Q. What do you mean by in the act of it, you were out there in the street, weren't you? A. I was out about one step.

"Q. Regardless of how far in it you were, were you out in the street when you say you were in the act of looking to your right, what do you mean? A. I looked to my left.

"THE COURT: You have answered that, there is no use in answering that any more. He is asking you what you mean by in the act of looking to the right? A. The next look that I would have made would have been to my right.

"MR. CORNELIUS: Q. If you had make a look, it would have been to your right, but you hadn't made it yet? A. I had not—

"MR. GREENE: Let him answer.

"THE COURT: He has asked you whether you had looked to the right. A. I was in the act of looking to the right.

"MR. CORNELIUS: Q. And that is the last thing you remember until you waked up in the X-ray room? A. Yes sir.

"Q. And that was in the middle of the block between Russell and Fatherland Streets, somewhere near the middle? A. It was nearer Fatherland than it was Russell a little bit.''

Certain testimony of Mrs. Elmore, the wife of plaintiff, relating to the "pool of blood" in the street and the condition of plaintiff's clothing was as follows:

"Q. Mrs. Elmore, did you go out and look at the scene of the accident the day after it happened? A. Yes sir.

"Q. Did you observe—here is your house, Mrs. Elmore, and over here is where your husband started across the street? A. Yes sir.

"Q. By the testimony in the case, and this is the center of the street, the imaginary visible line, did you discover anywhere in the street a pool of blood, dry blood? A. On up the street further there about, oh, I guess—

"Q. You mean up the street further toward Fatherland Street? A. Yes, sir, toward Fatherland, near the center.

"Q. Does this point here represent approximately about where it was? A. Yes sir.

"Q. Was it near the center of the street? A. Yes sir.

"MR. CORNELIUS: Take this piece of chalk then and mark that, make that mark a little bit bigger, Mr. Keeble, I have been puzzled about where you have been putting your chalk, so she was over there. What did she say she saw over there?

"MR. GREENE: A pool of blood.

"MR. KEEBLE: Q. Would you say that was in the exact center of the street. A. About the center.

"Q. About the center? A. Yes sir.

"Q. Which side, was it more to, if either? A. May be a little to the right of the center.

"Q. A little to the right, so close it would be hard to determine? A. Scarcely at all.

"Q. Mrs. Elmore, I will ask you if these are the clothes worn by your husband the night of the accident? A. Yes sir.

"Q. This is the coat which he had on? A. Yes sir.

"Q. I suppose that you saw his clothes before he went to work that morning? A. Yes sir.

"Q. Were they torn? A. No sir.

"Q. And tattered like that? A. No sir.

"Q. We want the jury to look at that place—pass that down. This is his shirt I suppose? A. Yes sir.

"Q. And these are the trousers that he had on at the time of the accident? A. Yes sir.

"Q. All of these torn places were the result of the accident, that is to say you know they were not there when he left that morning? A. No, they were not."

The witness Morris Hager, a retail grocer with a store at the corner of Fatherland and South Tenth Streets, learned that an ac-

cident had occurred on South Tenth Street near his store and went immediately to the scene of the accident. Mr. Hager was well acquainted with the defendant Mrs. Thompson. We quote from Hager's testimony as follows:

"Q. Did you see Mrs. Thompson? A. I didn't see her as I went by the car, and I heard somebody call Mr. Hager, and I recognized her, and she recognized me and called me.

"Q. What did she say? A. She said, I have struck a man and I didn't see him until his hat flew up, I don't know where he came from, she said she didn't see him.

"Q. Said, I have struck a man, I didn't see him until his hat flew up, I don't know where he came from, I didn't see him at all? A. Yes sir.

"Q. That is the substance of it? A. Yes sir.

"MR. CORNELIUS: How soon was that after the accident? A. About five minutes. . . .

"Q. Now, did you see Mr. Elmore? A. Yes sir.

"Q. Where did you see him, Mr. Hager? A. He was right there about the gutter, he had been removed from the street on the gutter, sitting on the sidewalk, Mr. Oglesby was holding him.

"Q. What was his condition? A. It was dark of course, I saw the blood coming from his head, he was lying down.

"Q. As far as you know he was lifeless? A. Oh yes, he seemed to be unconscious at the time, I think he came to though before they put him in the car.

"Q. And this little circle here would represent a telephone pole that was then where his body was, you would say was where with reference to that telephone pole? A. It was south of that pole about probably ten feet, something like that.

"Q. Do you know whether there is a little grass plot here? A. Yes, that is the sidewalk.

"Q. Was that about the location of his body? A. Yes sir.

"Q. Now, the street there, Mr. Hager, you have lived out there on that street about how long? A. All my life.

"Q. All your life, is there anything unusual about the contour of that street, what is the surface made out of? A. It is that asphalt.

"Q. Yes, well is it a fairly level street? A. Yes sir.

"Q. Has it any big hump in the middle of it? A. No sir.

"Q. Roll a car on the road over to one side, turn over, anything like that? A. No sir.

"Q. The street was a little moist that night? A. Yes, it had been raining, sprinkling, a little, the street was kind of wet.

"Q. Now was there somebody with Mrs. Thompson? A. Yes sir, a lady.

"Q. A lady was with her, and you offered to come over and take her car home, didn't you? A. Yes, I didn't know how she would be after the accident, and I offered if there was any help that I could assist her any in taking the car back where she wanted to go, and she said no, she could manage it all right.

. . . .

"Q. Now, at the time that Mrs. Thompson here talked with you after the accident, where was she, Mr. Hager? A. She was right at the scene of the accident, as I passed by she recognized me with my apron on, and she has known me for years too, and she called me by name, and of course I recognized her then, and I walked back toward her.

"Q. She and the other young lady were apparently quite concerned about the matter, weren't they? A. Yes sir.

"Q. Excited and wanting to do whatever they could? A. Yes, she said she didn't see how she hit him, she didn't see any one there, and I offered my assistance that I might be able to render and at that time he was being put in the car, all the assistance that was possible was being rendered at that time.

"Q. You didn't hear Mrs. Thompson offer to take him to the hospital in her car, or let somebody else drive the car? A. A car was driven up there while I was talking to her, and the other party he said put him in my car.

"Q. Did you examine the spot of blood in the street? A. Yes sir, I saw where that was.

"Q. Where was that? A. It was just a little bit to the right of the center.

"Q. When you say to the right, would that be to the east or to the west? A. Well, it would be to the west.

"Q. West? A. Yes sir.

"Q. Just a little bit west of the center? A. Yes sir."

Two young men, C. N. Jackson and his cousin W. L. Jackson, testified at the trial that they were driving southward on South Tenth Street on the night in question and saw (ahead of them) an unoccupied car parked about the middle of the street with its lights burning and the body of a man lying in the street a few feet behind the car.

We quote from the testimony of C. N. Jackson as follows:

"Q. You were going in a southerly direction, south on this street, is that right? A. Yes sir.

"Q. And over on this side would be to the west and the east over on here, over here would be to the east, all of that is understood by you well, isn't it? A. Yes sir.

"Q. Now, when you got there, did you stop your car? A. Yes sir.

"Q. Now, why did you stop? A. I saw the man lying in the street.

"Q. Saw a man lying in the street? A. Yes sir.

"Q. I have drawn a dotted line through what is supposed to be the middle of that street, you can see that dotted line, can you? A. Yes sir.

"Q. Where was this man lying with reference to that line? A. Well, if that line is middleways of the street, he was lying somewhere along about middleways I reckon.

"Q. About middleways of the street? A. Yes sir.

"Q. Do you remember where his head was, was his head the farther part from you or his feet, when you drove up? A. I don't remember.

"Q. You don't remember that? A. No sir.

"Q. What did you and your cousin do? A. We got out of the car, parked it down there, below him, went up there to help pick him up and lay him up on the sidewalk.

"Q. Did you notice anything ahead of his body as he lay in this street? A. There was a car parked on the street.

"Q. Where was that car in the street? A. It was somewhere about middleways of the street.

"Q. Somewhere about middleways of the street? A. Yes sir.

"Q. Now, if this dotted line here, if it was about in the middleways of that street, would the chassis or body of the automobile be over the middle line of that street? A. Well, I just don't remember.

"Q. But the car was about the middle of the street? A. yes sir.

"Q. You wouldn't know whether it was to the right or to the left of it? A. No sir.

"Q. Anybody in it? A. No sir.

"Q. Did you notice any ladies around there? A. I noticed one talking to Mr. Hager.

"Q. You noticed one talking to Mr. Hager? A. Yes sir.

"Q. Did she say that was her car? A. I never did hear her say, but she kind of pointed to it.

"Q. Pointed toward the car? A. Yes sir.

"Q. It was unoccupied, what kind of a car was it? A. I just don't remember, it was a Chevrolet though of some make.

"Q. It was a Chevrolet of some type, was it? A. Yes sir.

"Q. You picked the man up, you and your cousin and who else? A. I don't know who the other fellow was.

"Q. There was another man and the three of you picked him up? A. Yes sir.

"Q. From the middle of the street and carried him over to the side here? A. Laid him on the sidewalk.

"Q. And did he appear to have any life in him? A. Not a bit.

"Q. Did you notice his head and his eyes? A. His head was cut and bleeding right smart.

"Q. How about his eyes? A. His eyes were just set in his head, looked to me like.

"Q. In a glare, were they? A. Yes sir.

"THE COURT: Was that car facing north or south? A. Facing south, I reckon, facing towards Fatherland Street?

"MR. GREENE: Q. Facing towards Fatherland Street? A. Yes sir.

"Q. Were there any other automobiles in the street at the time you came up? A. No sir, I didn't notice any other one that was in the street.

"Q. That was the only one you noticed? A. Yes sir.

"Q. And these ladies were just to the right of it over on the sidewalk? A. Yes sir."

W. L. Jackson testified as follows:

"Q. On Hallowe'en night last year, were you with your cousin in an automobile on South Tenth Street? A. Yes sir.

"Q. Had you come up there where anything unusual had happened? A. Was that new place?

"Q. I say you had come up to a point on South Tenth Street where something out of the ordinary had taken place, hadn't you? A. Yes sir.

"Q. I wish you would just tell these twelve men here what you saw? A. Well, we were going up South Tenth Street, driving along, and I seen this car parked, it was about the middle of the street with its lights shining so that this body was ten or twelve feet from the car, and we went over and picked this man up and laid him over on the pavement, and I went to call an ambulance, and when I returned they were putting him in an automobile to take him off, before the ambulance arrived.

"Q. Now, Mr. Jackson, you saw the man in the middle of the street, and you saw him behind the car, is that right, behind the automobile? A. Immediately behind the automobile.

"Q. Do you mean that the back of the automobile was ahead of his body? A. Yes sir.

"Q. The automobile was not to one side of his body then? A. No sir.

"Q. Do you know which way his head was pointing, or his feet? A. I don't remember.

"Q. What was his condition when you lifted him over there, did he appear to be conscious, or without any life? A. No sir, I thought he was dead."

It is a reasonable inference from the circumstances in evidence, including the statements of defendant Mrs. Thompson to the witness Hager, that Mrs. Thompson was driving the automobile which struck and injured the plaintiff. This seems to be conceded (at least, tacitly) by counsel for defendants. It was stipulated at the trial that "the car" was registered in the name of Mr. Robert L. Marshall, Jr., which we interpret as a stipulation that the car which struck and injured plaintiff was registered in the name of the defendant Robert L. Marshall, Jr. This was prima-facie evidence that defendant Robert L. Marshall, Jr., was the owner of said automobile, and that at the time of the collision which injured plaintiff said automobile was being operated for the use and benefit of its said owner. (See Public Acts of 1921, Chapter 162, as amended by Chapter 59 of the Public Acts of 1923.) It follows from this that defendant Marshall is chargeable with any negligence attributable to defendant Mrs. Thompson in the premises, and if the latter is liable in damages in this case, the former is likewise liable, although, so far as appears, he was not in the automobile at the time of the accident, and there is no direct evidence tending to show the relation, if any, between him and his codefendant, Mrs. Thompson.

Accepting the testimony of the plaintiff and his witnesses as the truth of the case (which we must do under well settled rules), the plaintiff was about the middle of the eastern half of South Tenth Street when he was struck by the car driven by Mrs. Thompson, and he was either thrown by the force of the impact, or shoved by the car, or carried on some part of the car, to a point near the center of the street, forty-five feet from the place where the collision occurred. The car passed beyond the body of plaintiff a distance of ten or twelve feet, plus the length of the car; that is to say, the car ran fifty-five or fifty-seven feet, plus its own length, beyond the point of the collision before it stopped.

The defendant's automobile not only threw or shoved or carried plaintiff forty-five feet, but it struck him with sufficient force to inflict injuries upon his person which are described by Dr. O. G. Nelson, the physician who attended him at the hospital (reading from his notes made at the time plaintiff was brought to St. Thomas Hospital), as follows:

"The patient on admission is in a state of delirium, is wildly calling over and over again for his wife, who is in the room, he apparently does not know she is there, he lapses into uncon-

sciousness for short periods, and on coming out cries with pain in the neck and headache. There is a contused traumatic wound, rough edged, jagged wound two and one-half inches long down to the bone at the tempero-parietal suture, at this place on the head at the temple on the right side, it extends forward, down from the forehead. This was painted with an antiseptic and three stitches put in. There is an abrasion on the right cheek, the skin rubbed off the right cheek in an area one inch by half an inch wide. There is an abrasion on the right leg on the outer side of the upper end of the fibula, this portion of it. There is also an abrasion at the right superior spine of the ilium right over the pelvic bone at this place. There is a contusion of the right leg on the upper portion of the calf, the posterior and lateral side, a big bruise at the back of the right calf, and on the side. There is some extravasation of blood in the tissues— That is the blood vessels had been ruptured and some blood had poured out underneath the skin and not allowed to come out, an extravasation of the blood we call it. X-ray shows fracture clinoid process, posterior, of sella turcica, that is a very small bone inside of the skull, and I have an X-ray picture.

"Q. Well, go ahead, just finish there on that. A. There is also a contusion or bruise of the posterior muscles of the neck, he complained of pain in the neck, they were sore to the touch."

Direct testimony is not essential to warrant a finding of excessive speed. Evidence as to the force of the impact of a collision, or as to the distance which an automobile causing an injury overshot the point of the accident before being brought to a standstill, is of significance, and may be by itself, or in connection with other circumstances, of sufficient force to warrant a jury in finding negligence as to speed, and in drawing an inference that the machine was traveling at a rate of speed such as to endanger the life or limb of persons upon the highway. 2 Blashfield's Cyclopedia of Automobile Law, 1733-1737, and numerous illustrative cases there digested. See also pages 1698-1703 in same volume, and 1 Berry on Automobiles (6 Ed.), sec. 433 (at bottom of p. 372); Collins v. Desmond, 1 Tenn. App. R., 54, 60; Bombard v. Newton (Vt.), 111 Atl., 510, 11 A. L. R., 1402; Sullivan v. Chauvenet, 222 S. W., 759, 761, 282 Mo., 649; Kennedy v. Bruce, 5 Tenn. App. R., 583, 585.

We therefore conclude that there was evidence to take the case to the jury for a finding as to whether the automobile which struck plaintiff was then and there being driven at a rate of speed which violated the aforesaid city ordinances limiting the speed of vehicles.

The next inquiry is, whether there was evidence that, at the time defendant's car struck plaintiff, it was being operated in violation of the aforementioned City Ordinance requiring that "a vehicle,

except when passing a vehicle ahead, shall keep as near the right-hand curb as possible.''

The City Ordinance above quoted was manifestly designed for the protection of travelers upon the streets of the City of Nashville, and if defendants violated it they were guilty of negligence per se. Hines v. Partridge, 144 Tenn., 219, 229, 231 S. W., 16; Power Packing Co. v. Borum, 8 Tenn. App. R., 162, 166; Kennedy v. Bruce, 5 Tenn. App. R., 583, 585.

In the Indiana case of Bennighof-Nolan Co. v. Adcock, 29 A. L. R., 1344, the Court expressed a doubt of the reasonableness (and therefore of the validity) of the City Ordinance in terms substantially the same as that here involved.

But the Supreme Court of Missouri, in the case of Smith v. Mederacke, 259 S. W. 83, upheld an ordinance couched in the exact language of the ordinance of the City of Nashville here under consideration, holding that the ordinance should be construed as a requirement that vehicles must keep as near the right-hand curb as reasonably or practicably possible, and also holding that said ordinance was passed for the protection of pedestrians (so that they would know where to watch out for vehicles) as well as for persons traveling in vehicles.

Smith v. Mederacke, supra, seems to be the leading case on this subject. See 1 Blashfield's Cyclopedia of Automobile Law, 528.

In Power Packing Co. v. Borum, supra, a judgment of the Circuit Court, based on the verdict of a jury, in favor of Borum, was affirmed by this Court, and certiorari was denied by the Supreme Court. In that case, one of the acts of negligence averred in the declaration, and on which the verdict and judgment were based, was the violation by the defendant's truck driver of the same ordinance of the City of Nashville which we are now considering.

The validity of said ordinance has not been questioned in the instant case. We agree with the Missouri Court, supra, that the ordinance in question should be construed as requiring vehicles to keep as near the right-hand curb as reasonably or practicably possible, and that it was intended for the protection of pedestrians as well as vehicular traffic.

The reasonable inference from plaintiff's testimony, taken in connection with other circumstances in evidence, is that plaintiff was not more than six or seven feet from the eastern curb of South Tenth Street when he was struck by defendant's car. The street was twenty-six feet wide between curbs, and the ordinance in question, when applied to the circumstances of this case, required that defendant's car be driven as near the western curb as was reasonably or practicably possible.

In our opinion, there was evidence sufficient to take the case to the jury for a finding as to whether the defendants were guilty of negligence in two particulars charged in plaintiff's declaration, viz: (1) excessive speed in violation of the traffic ordinances of the City of Nashville, and (2) driving on the eastern half of South Tenth Street in violation of the aforesaid city ordinance requiring them to drive as near the western curb as reasonably possible.

The remaining inquiry is whether, upon a consideration of the whole evidence, with all inferences favorable to the plaintiff which may be reasonably drawn therefrom, it could be held, as a matter of law, that the plaintiff was guilty of negligence which proximately contributed to his injuries? If this question be answered in the affirmative, the judgment of the Circuit Court, directing a verdict for the defendants and dismissing plaintiff's suit, must be affirmed, although there is evidence that the driver of the defendants' car was negligent as averred in the declaration. Mayor & Aldermen of Knoxville v. Cain, supra, pp. 257-258; Traction Co. v. Brown, supra, pp. 331-332; St. Louis, etc., Railway Co. v. Young, 4 Tenn. App. R., 152, 158.

When the plaintiff was injured he was admittedly crossing South Tenth Street near the middle of the block between Russell and Fatherland streets, and not at a street intersection or cross-walk. It was held in Leach v. Asman, 130 Tenn., 510, supra, that, in the absence of a municipal ordinance governing the matter, a pedestrian has equal rights with automobilists to the use of the street and may cross the street at any point, being bound to exercise ordinary care for his own safety, to be measured by the situation confronting him, such as the immediate circumstances of place and condition demand. (Page 515.)

It is claimed on behalf of defendants that, by an ordinance of the City of Nashville, known as Section 14 of Ordinance No. 385, pedestrians were forbidden to cross the streets except at "street crossings" (intersections or cross-walks), and that plaintiff was therefore guilty of negligence per se when he attempted to cross South Tenth Street in the middle of the block, as he was doing when he was injured.

No such ordinance as that just mentioned appears in the bill of exceptions or elsewhere in the record before us, but it is stated in defendants' brief, and conceded in plaintiff's brief, that there was an ordinance of the City of Nashville in these words:

"Sec. 14. Be it further enacted, That pedestrians shall not step from the sidewalks to the roadbed without first looking to see what is approaching, and shall not needlessly interfere with the passage of vehicles or street cars. Persons waiting for street cars shall not step from the sidewalk to the roadbed

until the street car approaches. While the roadbeds of streets and highways are primarily intended for vehicles, pedestrians have the right to cross them in safety, and pedestrians·in their turn must not cross the streets except at street crossings and shall cross the streets as nearly as possible at right angle, and not diagonally. This provision, however, shall not excuse the driver of any vehicle from constant vigilance to avoid injury to pedestrians under all conditions or from his own carelessness.''

The record shows that, at the beginning of the trial below, there was an oral stipulation by counsel, in open court, that ''the City Ordinances that are averred in the declaration'' were ''correctly copied'' and ''correctly proven;'' but Section 14 above quoted was not ''averred in the declaration,'' and hence, was not included in this stipulation.

Again, there appears in the bill of exceptions (at the close of the testimony of the witnesses but before the plaintiff closed his case) a colloquy between Mr. Greene (attorney for plaintiff and Mr. Cornelius (attorney for defendants) and the Court, as follows:

''MR. GREENE: I don't think Gen. Cornelius would object to admitting that South Tenth Street is in the corporate limits of the City of Nashville.

''MR. CORNELIUS: Oh, yes.

''THE COURT: Is that stipulated?

''MR. GREENE: We stipulated about the ordinances, I suppose it would include that, that South Tenth Street is in the City of Nashville, in the corporate limits of the City of Nashville.

''MR. CORNELIUS: Yes, I don't know of any other stipulation that I made.

''THE COURT: Just that this car, that this car license number was registered in the name of Mr. Robert L. Marshall, Jr.

''MR. GREENE: And these city ordinances.

''MR. CORNELIUS: No, I haven't about the city ordinances.

''THE COURT: He has only stipulated to this effect, that he would not require you to introduce proof from the city hall showing that there were such city ordinances.

''MR. GREENE: Well. I have this pamphlet here.

''MR. CORNELIUS: You want to introduce the entire pamphlet as being a copy of the ordinances?

''MR. GREENE: Yes.

''MR. CORNELIUS: I didn't understand that, I thought you wanted to prove those that you have alleged in your declaration, and you could read those. If you want the whole pamphlet in it is all right.

"MR. GREENE: Here it is, Ordinance 385.

"THE COURT: Then the Ordinances you are relying on are substantially set out in the declaration as they are in the pamphlet?

"MR. GREENE: They are copied literally, Your Honor please.

"THE COURT: That is sufficient, they are introduced in evidence."

It is thus seen that plaintiff's attorney had present in Court at the time of the foregoing colloquy a pamphlet containing City Ordinance No. 385, and stated that he wanted "to introduce the entire pamphlet as being a copy of the Ordinances." Defendants' attorney then said, "if you want the whole pamphlet in it is all right;" but it is obvious that the trial judge understood that no one was seeking to prove any ordinances except those set out in plaintiff's declaration, and that they are the only city ordinances which were at any time made a part of the record. Cosmopolitan Life Insurance Co. v. Woodward, 7 Tenn. App. R., 394. Not being a part of the record below, it follows, under settled rules, that said ordinance cannot be considered here.

However, we do not think that the exclusion from consideration of the aforesaid ordinance copied from the brief affects the results in this case, for while pedestrians are thereby forbidden "to cross the streets except at street crossings," this prohibition is followed by the proviso that its violation "shall not excuse the driver of any vehicle from constant vigilance to avoid injury to pedestrians under all conditions or from his own carelessness."

The proviso just quoted seems to be declaratory of the general law; that is to say, an ordinance forbidding pedestrians to cross the street except at street intersections does not relieve the driver of an automobile from liability for injuring a pedestrian violating the ordinance, if the carelessness of the automobilist was the proximate cause of the injury to the pedestrian and the negligent act of the pedestrian was only a remote cause. Ivy v. Marx (Ala.), 14 A. L. R., 1173; 2 Blashfield's Cyclopedia of Automobile Law, 1160, 1161; 1 Berry on Automobiles (6 Ed.), sec. 355; 42 C. J., 1038, sec. 785.

"The proximate cause of an injury may, in general, be stated to be that act or omission which immediately causes or fails to prevent the injury; an act or omission occurring or concurring with another, which, had it not happened, the injury would not have been inflicted." Deming & Co. v. Merchants Cotton Press, etc., Co., 90 Tenn., 306, 353, 17 S. W., 89, 13 L. R. A., 518. But the "proximate cause is not necessarily that which is next or last in time or place, but that which is a procuring, efficient, and predominant cause. Close-

ness in causal relation, rather, is the meaning." Grigsby & Co. v. Bratton, 128 Tenn., 597, 603, 163 S. W., 804.

The "remote cause" of an injury is "that which may have happened and yet no injury have occurred, notwithstanding that no injury could have occurred if it had not happened." Anderson v. B. & O. Railroad Co. (W. Va.), 51 L. R. A. (N. S.), 888, 892; Note, 36 Am. St. R., 809.

There is a marked distinction between the proximate cause of an accident, and the proximate cause of the injury resulting from the accident. 22 R. C. L., 115; Anderson v. Miller, 96 Tenn., 35, 33 S. W., 615, 54 Am. St. R., 812, 31 L. R. A., 604; Deming & Co. v. Merchants Cotton Press, etc., Co., supra.

Even though the plaintiff had been forbidden by municipal ordinance to cross the street at the place where he was injured, it was the duty of the driver of defendants' automobile to keep as near the western curb as practicable or reasonably possible, and also to refrain from driving at such a speed as to endanger 'the lives and property of others.

A pedestrian may assume, in the absence of any thing indicating the contrary, that a motorist will not approach on the wrong side of the street or at an unlawful rate of speed. 2 Blashfield's Cyclopedia of Automobile Law, 1016, 1017, and note 33.

In order to defeat plaintiff's recovery his negligence must have not only contributed to his injuries, but it must have contributed thereto as a proximate cause, and not as a remote cause or mere condition. Armstead v. Lounsberry, 129 Minn., 34, 151 N. W., 542, L. R. A., 1915-D, 628, 631; N. C. & St. L. Ry. v. White, 158 Tenn., 407, 420, 15 S. W. (2d), 1; 2 Blashfield's Cyclopedia of Automobile Law, 1183, 1184.

If plaintiff had been violating the City traffic laws when he was injured, such violation would not have barred his action, unless it proximately contributed to his injuries. Black v. Moree, 135 Tenn., 73, 84, 185 S. W., 682; Hull v. Simmons, 7 Hig., 351, 357; 20 R. C. L., 121; Lindsay v. Cecchi (Del.), 35 L. R. A. (N. S.), 699; Note, 55 Am. Dec., 674; Note, 36 Am. St. R., 818; 2 Blashfield's Cyclopedia of Automobile Law, 1194, 1209, 1212-1214.

"There is a distinction between an unlawful or wrongful act which is at least a contributing cause of the injury sued for, and one which is merely an attendant circumstance or condition, though perhaps a necessary condition of the acts resulting in such injury. An event may be one without which a particular injury would not have occurred; yet, if it was merely the condition or occasion affording opportunity for other events to produce the injury, it is not the proximate cause thereof." Blashfield, supra, p. 1194,

The inquiry as to what is the proximate cause of an injury, like that of negligence, is always for the jury, unless the determinative facts are undisputed and are reasonably susceptible of but one inference. 22 R. C. L., 148, 149, Sec. 31; Dedman v. Dedman, 155 Tenn., 241, 248, 291 S. W., 449; Roofing & Mfg. Co. v. Black, 129 Tenn., 30, 37, 164 S. W., 1183; Collins v. Desmond, 1 Tenn. App. R., 54; Kelley-Powell Co. v. Landen, 7 Tenn. App. R., 92, 95; Clark v. Wallace, Anno. Cas., 1913-B, 349, 51 Colo., 437, 118 Pac., 973; Case Note, 27 Anno. Cas. (1913-B), 351-355; 2 Blashfield's Cyclopedia of Automobile Law, 1245-1249, Sec. 24; Case Note, 70 A. L. R., 1027; Gerhard v. Ford Motor Co. (Mich.), 20 L. R. A. (N. S.), 232, and Note; Hennessey v. Taylor, 189 Mass., 583, 76 N. E., 224, 3 L. R. A. (N. S.), 345, and Note.

Although, in the instant case, no evidence was heard except that offered by the plaintiff, and there are no substantial conflicts in the testimony of plaintiff's witnesses, we think that reasonable men might draw opposing inferences from the evidence with respect to the proximate cause of plaintiff's injuries, and whether negligent conduct of the plaintiff was the proximate cause of his injuries or concurred with negligence of the defendants as a proximate cause thereof.

It results that it was error to direct a verdict for the defendants, and the judgment of the Circuit Court is, therefore, reversed and the cause will be remanded to the Circuit Court of Davidson County for trial.

The costs of the appeal will be adjudged against the defendants Mrs. Thompson and Robert L. Marshall, Jr. The costs of the Court below will await the future judgment of that Court.

Crownover and DeWitt, JJ., concur.