BARNES et al. v. SCOTT.—243 S. W. (2d) 133.

Western Division. At Jackson. November 8, 1950.

Petition for Certiorari denied by Supreme Court, March 9, 1951.

136

James S. Wilkes, of Dyersburg, and Heathcock & Elam, of Union City, for plaintiffs-in-error.

E. H. Lannom, of Union City, and John M. Drane, of Newbern, for defendant-in-error.

SWEPSTON, J. The transcript is incorrectly styled. The defendants below have appealed, are the plaintiffs-in-error. The case should therefore be styled as we have it on the Caption sheet of this opinion. The attention of the Clerk of the Court below should be called to the proper styling of transcripts in law and equity appeals respectively.

This is an appeal in the nature of a writ of error by defendants below from a judgment in the amount of $6,500 rendered against them upon the verdict of a jury for personal injuries suffered by plaintiff, Mrs. Scott, as a result of an automobile, in which she was riding as a guest, colliding with the rear of the truck of defendant Barnes, which was parked partly on the highway and was being operated by his employee Hooper.

The declaration is in four counts, the first charging common law negligence in that on November 6, 1948, the involved truck was using the highway in an effort to extricate another of defendant's trucks which was stuck in the mud in a lot adjoining the highway where it had received a load of livestock for transportation; that having succeeded in freeing the loaded truck, the involved truck was driven out of the lot entrance and was parked on the concrete portion of the highway so as to occupy the greater portion of the east half, when there was ample room to park on the shoulder of the highway; that it negligently failed to move on to the shoulder of the highway when it saw or should have seen that the automobile in which plaintiff was riding was approaching; that there were no lights on the truck; and that no adequate warning was given by lights, horn or other means at hand of the position of the truck.

That the car in which plaintiff was riding as a guest of her husband, who was driving, was traveling in the same direction on said highway 51 in which said truck was headed and as he approached from the rear of said truck and on the east side of the highway and up grade the lights of the vehicle in the lot just off the east side of the highway shone across the highway and that a vehicle was approaching them from the opposite direction, when suddenly there appeared in front of them some one waving a flashlight in a circle and in the face of her husband, blinding him; that he immediately applied the brakes but was unable to stop and struck the said truck, as a result of which she was thrown partly out of the automobile and against the pavement and was seriously injured.

The second count charges violation of Code Section 2682 in that the truck was being operated so as to interfere with the use of the highway by vehicles following it; that Section 2690 was violated in that the truck was parked on the main traveled portion of the highway when it was practical to park same on the shoulder; that in violation of said Section there was not left free and unobstructed 15 feet on the main traveled portion of the highway; that in violation of Section 2695, subd. C, there was no fusee or electric lantern placed on the traffic side of the truck.

The third count charges that said truck was more than 80 inches wide and did not have lights as required by Section 2695, subd. A(e), particularly lights on the extreme ends of the width.

The fourth count charges violation of Section 2695 (C) (1) (2) &(3) in that no lights, flares, or pot torches were placed as required when defendants should have known

that more than 10 minutes use of the highway in extricating the other truck would be required.

Defendants plead the general issue and contributory negligence.

There are eighteen assignments of error.

■ The second going to the preponderance of the evidence is not proper on an appeal in a jury case.

The first and fourth go to whether there is material evidence to support the verdict.

There is evidence to show the following:

One Brown Flowers had contracted with defendant, Wylie Barnes, to haul some livestock from the Flowers farm located on Highway 51.

The livestock were to be loaded from a loading pen in a lot contiguous to and on the east of highway right of way. The pen was 70 feet from the entrance to the lot and the entrance was about 20 feet from the east edge of the concrete pavement of the highway. The entrance was a gap in the fence about 20 feet wide and from the edge of the concrete road to the entrance there was a wedge shaped cover of gravel about 50 feet wide along the edge of the concrete road and tapering down to the width of the entrance and then extended into the lot to the loading pen.

Barnes dispatched one truck late in the afternoon and a second about an hour later, allowing time for the first to load and be gone before the second one arrived. When the second one arrived at about 6:45 p.m. the driver found the first one loaded but mired on the side of the gravel driveway a short distance from the loading pen. He headed into the lot with the truck and trailer and tried without success to extricate the stuck truck. He backed out into the highway, went south about a quarter mile to a turnaround spot, returned and backed in and succeeded

in pulling the other truck-trailer back up on the gravel drive and to a point where that truck was about half way towards the entrance. He then drove the second truck out to the highway, turned right, or north, and parked it about 30 to 50 feet north of the lot driveway, partly on the concrete and partly on the shoulder of the road. There is evidence to show that the truck occupied 6 to 6½ feet of the east half of the road and that the shoulder was at least eight feet wide at that point from the east edge of the concrete to a shallow ditch and that the shoulder was very slightly sloping down from the level of the concrete.

After the truck was thus parked a bus coming from the opposite direction and headed south was flagged down by a colored boy, who was an employee of Flowers, and the bus came slowly alongside the truck and was either stopped or barely moving when the accident occurred. There is evidence that the front of the bus was two or three feet south of the rear of the truck at the time of the accident.

The lights of the bus were shining toward the south or direction from which plaintiff was approaching in the car driven by her husband; the lights of the other truck still in the lot were shining west across the highway at a slightly northwest angle and 30 to 50 feet behind the truck parked on the highway; there is testimony that no lights were lit on the truck parked on the highway.

Plaintiff's husband testified as follows:

"Q. Mr. Scott, I wish you would go ahead and tell the Court and the jury in your own way if anything happened as you drove along that highway—tell in detail as much as you can everything that occurred? A. Well, as we were driving along we were going down those hills up and down, and we were meeting traffic and saw a car on the other side—lights shining across; I didn't pay any atten-

tion, just saw it over there. When I got up there I didn't see any object in front of me until some fellow jumped out and shined a light in my face. When he stopped I could see I was right on the truck and I saw something on the left on the highway; I thought it was a truck and I would go between them, but I understand it was a bus. When he quit shining in my eyes I could see where I was.

"Q. Did you try to stop? A. Yes, I tried to stop but when he quit shining in my eyes I was so close to the truck I couldn't stop it, but I tried to stop.

"Q. Did you strike anything? A. I struck the truck and I understand I hit the side of the bus, but I hit the back end of the truck.

"Q. Which way was the truck headed? A. North.

"Q. Same way you were going? A. Yes.

"Q. Was it stopped? A. Yes.

"Q. What position was it in with reference to the concrete slab? A. Well, it was on the biggest part of the slab—practically on half of it.

"Q. You mean half of the slab? A. Yes, sir.

"Q. Now, where was this other vehicle—the bus? A. On the left just even with the truck.

"Q. The truck was going north? A. He was going north—the truck was going north and the bus was going south.

"Q. Was the bus along side the truck? A. Practically even with the truck.

"Q. Was the bus on the west side of that middle line of the highway? A. Yes.

"Q. Was it on the concrete slab? A. Part of it was. He was off as far as he could get.

"Q. Was there room sufficient for you to go between them? A. No sir.

"Q. How fast were you driving at the time that you say that flashlight was flashed in your face? A. I was driving around 35 or 40.

"Q. Had you come down an incline? A. Yes, sir, and was going up.

"Q. Do you know how long the incline is there? A. Pretty long incline there.

"Q. Were you near the top of it? A. Practically on top, yes, sir, a little over half way.

* * * * * *

"Q. Were your lights working all right that night? A. Yes, sir.

"Q. Were they on full? A. Yes, sir.

"Q. Did you see any other light there on that occasion except the headlights from the truck pointed out west and the bus coming south? A. That's all I saw—one headed west and the bus coming this way.

"Q. See any lights at all? A. Not until I was approaching the truck and some fellow shined a flashlight in my eyes.

"Q. You don't know who that was? A. No, sir.

"Q. Now, did you see any lights on the rear end of the truck that you struck? A. No, sir.

"Q. Did Mr. Barnes tell you who was driving his truck that night? A. No, sir, he just said it was his truck.

"Q. Mr. Barnes wasn't there—you didn't see him on that occasion, did you? A. No, sir.

"Q. Did he tell you what they were doing out there on the highway? A. No, sir.

"Q. Was there any fusee of any kind out on that highway up there? A. No, sir, wasn't no flares or nothing.

"Q. Mr. Scott, as you approached the scene of this collision were you looking ahead on the highway? A. Yes, sir, we were meeting a few cars and things and I was watching the road.

"Q. Was there an object ahead of you in the radius of your lights until this truck appeared after this flashlight was flashed in your eyes? A. No, sir.

\* \* \* \* \* \*

General Drane: Let him answer.

"A. Watching the highway where I was going. The next thing I knew somebody was waving a flashlight in my eyes; when he got out of the way I was right on that truck. When he commenced flashing the light I commenced slowing down trying to stop; I was right on the truck then when he got out of the way.

"Q. If the Attorney General will permit, I would like to go back down the highway when you first saw the light on the Brown Flowers' tenant house coming across the highway? A. I saw a light.

"Q. You proceeded on north up the highway? A. Yes.

"Q. And you were watching traffic? A. Yes.

"Q. How many cars passed you? A. I didn't count them.

"Q. You didn't count the cars? A. I didn't.

"Q. You don't know then? A. No.

"Q. Did any pass you? A. Not that I can recall.

"Q. Then what traffic were you watching? A. The ones I met.

"Q. Did you meet anybody? A. I met some cars.

"Q. Going which way? A. South.

"Q. How many did you meet? A. I didn't count them.

"Q. Did you meet more than two or three? A. I wouldn't say, I don't remember.

"Q. As a matter of fact you didn't meet any? A. Yes, I met cars.

"Q. Were their lights on? A. Yes.

"Q. How fast were they going? A. I don't know.

"Q. You first saw the Brown Flowers light and you were meeting some traffic—you don't know how many, but some? A. Yes.

"Q. Then you continued down the highway. At anytime did you slow your speed of from 35 to 40 miles? A. I was driving about the same gait; I couldn't see nothing in front of me.

"Q. Nothing caused you to slow down or stop? A. Not until the fellow shined the light in my eyes.

"Q. The first flashlight was on which side—east? A. In front of me on the right.

"Q. Did you see any other flashlights? A. No.

"Q. You didn't see anybody swinging flashlights on the left side? A. No.

"Q. Or up about the truck? A. The only one I saw was the man waving it in my eyes.

"Q. Did he say anything to you as you passed by? A. No.

"Q. Didn't you hear him holler, 'Stop'? A. No I didn't.

"Q. Anyway, you didn't slow down? A. Not until he shined the light in my eyes.

"Q. From the time he shined the light until you hit whatever was in front of you how far did you go? A. I don't know; I commenced stopping; that was the only thing to do.

"Q. Did you apply your brakes? A. I did."

There is no dispute that no flares, pot torches, or electric lanterns were placed. The defendant's proof is that two men were south of truck and three north with flashlights and that all lights on the truck were lit except that the parking lights instead of the headlights were lit.

But a disinterested witness, Roy Sharp, testified that when he passed the truck shortly before the accident as he was going south or in the opposite direction from the way the truck was headed, he had to stop to let opposite traffic get around the truck; that there were no lights burning on it and no flashlights showing; that it occupied most of the east traffic lane; that he drove to Newbern, discharged a guest, turned about and when he arrived, the wreck had occurred a few minutes previously and that he assisted in extricating the plaintiff; that the elapsed time for his return to this location was 15 to 20 minutes.

Defendant's witness, Flowers, testified the truck was occupying most of the east lane.

Witness Tigrett, an insurance man, made measurements the next morning. He saw skid marks and a blood spot. His old 50 foot tape measure seems to have stretched because his measurement of the width of the highway was 18′ 6″, whereas it is a standard 18′; he said the blood spot was 6′ 9″ east of the east side of the concrete pavement; that the east skid mark was 23′ long, running from the blood spot at an angle with the road for 12′ and then curving around to parallel with the road; that from the blood spot or end of the skid mark to the entrance to Flowers' lot was 30′.

All witnesses who testified on the point said the right front of the automobile struck the left rear corner of the truck and that the front did not move forward any farther, but the rear swerved around to the left or west and struck the left front fender of the bus slightly back of

the front. All say that Mrs. Scott was thrown with her head and body onto the pavement at the left rear corner of the bus with her feet and legs still in the car, from which she had to be extricated.

Flowers said he was standing 30' to 40' south of the entrance to the lot, which was shown to be 20' wide; this with the testimony of Tigrett placed Flowers only 80' to 100' south of the rear of the truck, when the light from Flowers' flashlight blinded him. Scott's speed was 35 to 40 m. p. h.

The agreed dimensions of each truck was 7' 11" wide and 44' 6" long. The time of the accident was about 7:30 p.m.

Since the distance from the loading pen to the concrete road was approximately 90' and the combined length of the trucks was 89', it is evident that the eastern edge of the highway at least was in use in the entire operation for at least a half hour, because the mired truck was pulled some 30' to 40' from the loading pen.

At any rate there is evidence that the truck was parked on the highway more than 10 minutes.

The plaintiff was rendered unconscious for two days and remembers nothing after leaving home in Newbern.

 From the foregoing recital it is apparent that there was evidence to go to the jury on every count and these assignments must be overruled.

Assignments V, VI, and VII complain of the admission of testimony of plaintiff and her husband as to medical expense incurred by the husband, for the reason that he brought no suit and of course she could not recover it as an element of her damages.

In each instance the trial court told the jury it was competent only to show the extent of her injuries.

■ We doubt the competency of it for that purpose in the meager form it was offered, but we do not find it necessary to rule on the point, because the extent of her injuries was amply shown otherwise, so that we think the admission, if erroneous, was not prejudicial.

■ Assignment VIII complains of the admission of the question to Flowers whether, if the bus had not slowed down but had gone on by the truck, the Scott car could have passed around the truck successfully; and his answer: "If they hadn't met at the same time".

It is said this is a conclusion of the witness that involves the "whole essence" of the case.

We find no merit in this assignment. The flagging of the bus was only a part of the dangerous situation alleged to have been created.

Assignment IX complains of the admission in evidence of a sketch or plat of the locale made the day before the trial by witness Shuck.

■ The objection is specific "that the witness is not a surveyor, or experienced at drawing plats, and that the sketch is misleading in that it is not drawn to scale".

None of these objections is valid. 22 C. J. 910, Section 1114 and note 15, 32 C. J. S., Evidence, Section 730.

If the objection had been made that the map was not substantially accurate, it would have been valid. Bruce v. Beall, 99 Tenn. 303, 41 S. W. 445. However, its admission was not likely prejudicial because the witness said it was a rough sketch drawn for his own information.

The same is overruled.

■ Assignment X complains of the exclusion of a photograph called in the record picture No. 3 when offered by the photographer who took it on Sept. 30, 1949, or about ten months later and knew nothing of the position of the vehicle at the time of the accident, which

vehicle was placed on the road for the purpose of this photograph. The objection was properly made and properly sustained. However, the picture was later introduced as exhibit No. 1 to Robert Barnes.

This assignment is overruled.

Assignment XI and XII complain of the charge of the Court in that allegedly he did not correctly state the theory of the defendant in one and the theory of plaintiff in the other. If such be the fact, since the attention of the court was not called to the defect at the time, the right to complain now was waived. Long v. Tomlin, 22 Tenn. App. 607, 623, 125 S. W. (2d) 171.

Counsel cites two cases on his legal proposition that it is error to charge a matter not embraced in the pleadings, Fletcher v. Louisville & N. R. R. Co., 102 Tenn. 1, 6, 49 S. W. 739; Casey-Hedges Co. v. Browning, 2 Tenn. Civ. App. 358.

In the former the trial Court's attention was timely called to the error. In the latter, it does not appear whether attention was timely called.

These assignments are overruled.

Assignments XIII, XIV, XVI, and XVII relating to special requests are abandoned in the brief of the plaintiff-in-error.

Assignment XV complains of the refusal of the Court to charge as follows: "Now, gentlemen of the jury, the law is that the plaintiff as a guest or passenger in the car driven by her husband is chargeable with contributory negligence, if the accident was caused by inattention or carelessness on the part of the driver, or his failure to keep a proper lookout ahead, of which the plaintiff was aware and to which she made no protest or objection, which negligence, if not sufficient in your

minds to bar her recovery, should be considered by you in mitigation of her damages in this case''.

We do not think this request is a strictly accurate statement of law, because it fails to distinguish between proximate and remote contributory negligence; and is, therefore, a confusion of the two; it uses neither word nor any synonyms but simply *contributory* negligence, which may be either proximate or remote. If proximate, then it bars recovery, however slight, Bejach v. Colby, 141 Tenn. 686, 214 S. W. 869.

If remote, it does not bar recovery, but goes in mitigation of damages.

The gist of the test to be made by the jury is whether it is proximate or remote, not whether it is gross, medium, or slight.

■■■ Counsel in his brief characterizes the request as being for a charge of remote contributory negligence. Even if correctly requested, we do think it should have been granted. Under the definition of remote contributory negligence adopted in this state in numerous cases, such as Elmore v. Thompson, 14 Tenn. App. 78, 100; Phillips-Buttorff Mfg. Co. v. McAlexander, 15 Tenn. App. 618, 641, ''the remote cause of an injury is that which may have happened and yet no injury have occurred, notwithstanding that no injury could have occurred if it had not happened'', the alleged negligence of the plaintiff cannot be fitted into the same. The injury might not have occurred even though Mrs. Scott was guilty of negligence, or it may have occurred through the negligence of the driver even though she was guilty of no negligence.

Really the only evidential basis for a charge on proximate contributory negligence was that the jury might have found that she should have observed farther up

the road the lights and reflector said to have been on the truck and the flashlights, or if they were obscured by the light shining across the road and the light from the bus, that she should have taken the latter as a warning and called her husband's attention to them. But after her husband was blinded suddenly by the flashlight only 80′ to 100′ away from the truck, any warning from plaintiff would have been futile.

We are of opinion that McClard v. Reid, 190 Tenn. 337, 229 S. W. (2d) 505 is not in point.

The error in that case which was held to require a reversal, even though no special request had been tendered, was that the trial court, having properly charged remote contributory negligence, failed to charge that, if remote and not proximate, it must be taken in mitigation of damages.

We must overrule these assignments.

■ This disposes of all except assignment IV that the verdict is so excessive as to indicate passion, prejudice, or unaccountable caprice.

We have read the medical evidence and find that plaintiff's injuries were severe, numerous and painful, although most of them not permanent.

Her right collarbone and right forearm, in the ulna were fractured and an operation consisting of wiring the collarbone had to be performed eleven days later; the arm was placed in a plaster cast for several months.

The alveolar border of the right jaw was fractured completely knocking out one tooth and loosening another and bending a partial denture. The wire in the collarbone will have to be removed by a second operation. The right forearm is 15% impaired, but may improve hereafter to full use. There were severe bruises of the head, right shoulder, jaw and chest and leg, severe lacerations

on the forehead, the side of the face and both lips against the jaw and one or two on the neck, two extending across the forehead, down the face and lips to part of the chin. She suffered extreme nervousness and pain during the several months of hospitalization and office treatment.

The plaintiff appeared as a witness and the jury had the opportunity to evaluate her general condition and appearance a year later, especially the appearance of the scars on her face and neck.

Without going into further detail, we think we should not disturb the verdict which has been approved by the trial judge.

A judgment will be entered here for $6,500 with legal interest from October 29, 1949 and costs.

Anderson, P. J., and Baptist, J., concur.