PHILLIPS-BUTTORFF MANUFACTURING COMPANY et al. v. A. S. McALEXANDER, Administrator, etc.

Middle Section. August 6, 1932.

Petition for Certiorari denied by Supreme Court, March 18, 1933.

Wm. Howard Ewing, Alfred T. Adams and Norman Farrell, all of Nashville, for plaintiffs in error.

McConnico, Hatcher, Walker, Waller & Hooker, of Nashville, for defendant in error.

FAW, P. J. A. S. McAlexander, as administrator of the estate of his deceased wife, Mrs. Janie P. McAlexander, as plaintiff, recovered a judgment for $12,500 and costs against Phillips-Buttorff Manufacturing Company and H. A. McQueen, as defendants, in the Third Circuit Court of Davidson County, on June 11, 1931, and, after their motion for a new trial had been overruled, the defendants appealed

in error to this Court, and are here insisting, through assignments of error, briefs, and oral argument of counsel at the bar, that the trial court should have sustained the motion for a directed verdict made on behalf of each and both of the defendants at the close of all the evidence; that the trial judge erred, to the prejudice of the defendants, in his charge to the jury, and in refusing instructions requested by the defendants; and that, if this Court should hold that a verdict for plaintiff was proper, the amount of the verdict, for which judgment was rendered, was excessive.

For convenience, we shall continue to refer to the parties as plaintiff and defendants, as they appeared on the record in the trial court.

Plaintiff's intestate was struck by an automobile—a Ford coupe—owned by defendant Phillips-Buttorff Manufacturing Company and driven by defendant McQueen, between 5:30 and 6 o'clock P. M. on October 7, 1930, and died, as a consequence thereof, in the evening of the following day. She was continuously unconscious from the time of the accident until her death.

(We are using the word "accident" in its "loose and popular sense," rather than according to its strict definition. Sweeny v. Erving, 228 U. S., 233, 57 L. Ed., 815, 818.)

The deceased was thirty-three years of age, and an active, healthy woman, suffering from no physical or mental disability or infirmity. She was regularly employed in the office of an insurance agency in the business section of the City of Nashville, and lived with her husband (to whom she had been married about three years) in the Seminole Apartments situated on the south side of West End Avenue, a short distance east of its intersection with Twentieth Avenue.

The general direction of West End Avenue is east and west, and two street car tracks are located thereon—outbound or westbound street cars moving on a track located to the north of the center of the street, and inbound or eastbound street cars on a track located south of the center of the street.

The accident occurred in front of the Seminole Apartments and on the southern half of West End Avenue. The Ford coupe, driven by defendant McQueen, was traveling eastward. There was at that hour much westbound traffic on West End Avenue, but few cars were going east.

Defendant Phillips-Buttorff Manufacturing Company is a corporation engaged in manufacturing and merchandising in the City of Nashville, and it operates, among other things, a large foundry or factory for the manufacture of stoves or furnaces, and defendant McQueen was, at the time of the accident in question and for several years theretofore, employed by defendant Phillips-Buttorff Manufacturing Company as paymaster at said foundry.

A. S. McAlexander duly qualified as administrator of his deceased wife, and thereafter, viz: on October 17, 1930, brought this action in the Circuit Court of Davidson County, and it was transferred to the Third Circuit Court, where it was tried before Special Judge William A. Guild and a jury, upon the issues made by the plaintiff's declaration and separate pleas of not guilty filed by the defendants, respectively.

The declaration contains three counts. The first count, after the statement of some of the undisputed facts which we have heretofore related, contains averments as follows:

"That on the late afternoon of said date plaintiff's intestate alighted from an outbound or westbound street car, at or near the intersection of Twentieth Avenue North and said West End Avenue, intending to cross over West End Avenue from the point where she alighted from said street car to the south side of said West End Avenue to reach her home; that as plaintiff's intestate was crossing said West End Avenue going south, defendant McQueen, in charge of and driving said automobile of the defendant Company in furtherance of its business, at the same time was proceeding in an easterly direction on said West End Avenue towards the main part of the City, and at a time when, and place where, said defendant McQueen knew, or should have known, that pedestrians were likely to cross said West End Avenue in front of him, since said outbound street car had just left the intersection of said two streets, proceeding westwardly; that while plaintiff's intestate was crossing south on West End Avenue, because of said defendant McQueen's failure to keep a proper lookout ahead, and at a time and place when the defendant saw, or should have seen, her, he wrongfully, carelessly, recklessly and negligently drove said automobile upon and against plaintiff's intestate, with great force and violence, knocking and hurling her body through the air, and dragging it many feet in the street, so crushing, maiming and mangling her head and other parts of her body that, after lingering for many hours, she died the next day, to-wit October 8, 1930, leaving surviving her the plaintiff, her husband.

"Plaintiff's intestate was a dutiful housewife, active, healthy and energetic, and had a long expectancy of life, and plaintiff sues the defendants for the pecuniary value of her life and demands a jury to try her cause."

The second and third counts each adopts all the averments of the first count, and in the second count it is averred that defendants' said automobile was, at the time it struck plaintiff's decedent, operated in excess of thirty miles an hour in violation of an ordinance of the

City of Nashville making it "unlawful for any vehicle to exceed a speed of thirty miles per hour within the corporate limits of said City."

In the third count it is averred that at the time when and the place where the accident in question occurred, defendant McQueen was driving said automobile which struck plaintiff's intestate, in violation of a certain specified traffic ordinance of the City of Nashville which provided that "a vehicle, except when passing a vehicle ahead, shall keep as near the righthand curb as possible."

Through their first and second assignments of error the defendants assert (1) that there was no evidence before the jury that they were guilty of negligence as charged in the declaration, and (2) that the deceased, Mrs. McAlexander, was guilty of proximate contributory negligence which should bar plaintiff's action.

And through the second assignment of error defendant Phillips-Buttorff Mfg. Co. makes the further question that it is not liable in damages to the plaintiff because "at the time of the accident McQueen was not engaged in the business of defendant Company."

It is stated that, for the reasons thus presented through the first and second assignments of error, the trial court erred in not sustaining the motion of the defendants for a directed verdict in their favor.

It is an undisputed fact that defendant McQueen was in the general employment of defendant Phillips-Buttorff Mfg. Co. as a paymaster at the foundry or factory of the latter at the time of the accident which caused the death of Mrs. McAlexander. But the mere fact that the driver of an automobile was in the general employment of the owner of such automobile when an accident, resulting in injury to a third person, occurred will not make the owner liable for the negligent conduct of the driver. "It must be further shown that at the time of the accident the driver was on the master's business, and acting within the scope of his employment." Goodman v. Wilson, 129 Tenn., 464, 467-8, 166 S. W., 752, 51 L. R. A. (N. S.), 116; Core v. Resha, 140 Tenn., 408, 412, 204 S. W., 1149; Lampley v. Fain, 6 Hig., 519; Yellow Cab Co. v. Bailey, 5 Tenn. App., 349, 354; Woody v. Ball, 5 Tenn. App., 300; Welch v. Young, 11 Tenn. App., 431, 436.

The true test is "not permissive use but use in the employer's business." Core v. Resha, supra, p. 415; Fisher v. Fletcher (Ind.), 22 A. L. R., 1392, and Annotation, page 1397 et seq.

It appears from the record, without dispute, that the Ford coupe involved in this case was registered in the name of the defendant Phillips-Buttorff Mfg. Co. Such registration was (by virtue of the Act of 1921, ch. 162, as amended by the Act of 1923, ch. 59) prima facie evidence that said automobile was, at the time it struck and

fatally injured Mrs. McAlexander, being operated by defendant McQueen for the use and benefit of defendant Phillips-Buttorff Mfg. Co. and within the course and scope of McQueen's employment as the servant of his said co-defendant.

But it has been repeatedly held that the Legislature did not intend, by the statute last above cited, to create more than a presumption, and "when the proofs are present there is neither foundation nor room for the presumption." Frank v. Wright, 140 Tenn., 535, 448, 205 S. W., 434; Woody v. Ball, supra, 303-304; Welch v. Young, supra, 436-437.

It appears from the testimony of Mr. D. W. Binns, President of the Phillips-Buttorff Mfg. Co., and also from the testimony of defendant McQueen, that the Ford coupe which defendant McQueen was driving at the time of the accident here in question was bought by the Phillips-Buttorff Mfg. Co., in the Spring of 1930—several months before the death of Mrs. McAlexander in October, 1930; that then and theretofore defendant Company owned a large number of automobiles and motor trucks which were used in its business and were stored in its garages when not in use; that prior to the purchase of the said Ford coupe the Company had owned a five-passenger automobile which was kept at its foundry "for the purpose of running errands and taking men to the doctor etc.;" in other words, a kind of general utility car, but this latter car had "worn out" and had been discarded, and the Company had decided that it would not buy another car to take its place.

However, as a consequence of a proposal made by defendant McQueen to the defendant Company, through Mr. Binns, its President, a used car, viz: the Ford coupe in question, was bought and owned by defendant Company, but the purchase was made pursuant to an agreement between defendant McQueen and the Company that defendant McQueen would pay for the maintenance of the car, that is, for all the gasoline, oil, and repairs, including tires, needed for its operation and upkeep; that during business hours the car should be at all times available for the use of the Company at its foundry, but that after business hours each day (which ended at 5:30 o'clock P. M.), and on Sundays and holidays, the car should be in the possession of defendant McQueen, with the right in him to use it as he pleased for his own personal business or pleasure.

From and after its purchase by defendant Company as aforesaid until, and at the time of, the accident in question said Ford coupe was used and operated in accordance with the agreement under which it was purchased.

Defendant McQueen lived on Russell Street in East Nashville, and the greater part of the time the Ford coupe was kept in the garage

at his home at night after bedtime, although now and then he would spend a night or week-end or holiday with relatives or friends and keep the car elsewhere.

In other words, after business hours each day, the car was altogether subject to the personal use and control of defendant McQueen, for his own benefit or pleasure, and defendant Phillips-Buttorff Mfg. Co. not only did not control and direct its use after business hours, but had no right to control and direct the manner and place of its use or storage except during business hours.

On October 7, 1930, defendant McQueen left the foundry of defendant Company about 5:30 o'clock P. M. in said Ford coupe. He invited J. J. Bell, a friend who was also employed at the foundry, to ride with him, telling Bell that he would carry him to his (Bell's) home. Bell lived at No. 2010 Charlotte Avenue, which is in the western part of the City of Nashville. Bell accepted the invitation, and McQueen drove to Bell's home, thence south on Twenty-first Avenue to West End Avenue, and was traveling eastward on West End Avenue, on the way to his home in East Nashville for dinner, when the accident occurred.

Defendant Phillips-Buttorff Mfg. Co. was not obligated, by contract or otherwise, to furnish transportation to McQueen or to Bell from the foundry to their respective homes, and was not accustomed to do so. McQueen's invitation to Bell was merely an act of friendly accommodation, and not in the performance of any duty or service owing by him to his employer.

The facts of the present case clearly distinguish it from the case of Hall Grocery Company v. Wall, 13 Tenn. App., 203, in which latter case the Court said: ''It appears uncontradicted that, with the knowledge of defendant and without objection, the driver of this particular truck had from time to time after making the last delivery of the day, carried the truck to his home for safe keeping over night and in doing so was performing a duty for his master and not using the truck for his own benefit, but as an incident to his employment.'' (Page 208.)

The testimony of Mr. Binns and defendant McQueen, with reference to the agreement under which the Ford coupe was purchased and the manner of its use after its purchase, is undisputed, and there was no attempt to impeach the general character of either of said witnesses in any respect. McQueen was contradicted by some of plaintiff's witnesses with respect to certain other material facts; and if the contention of defendant Phillips-Buttorff Mfg. Co. that McQueen was not engaged in its business at the time of the accident, had depended solely on McQueen's testimony, his credibility would have been a matter for the jury to determine. Welch v. Young, 11 Tenn. App., 431, 441.

But the testimony of D. W. Binns is not contradicted in any particular, and he fully corroborates the testimony of McQueen touching the agreement under which the Ford coupe was bought and kept, and the manner of its use. Testimony may not be disregarded arbitrarily or capriciously; and the testimony of a witness who is not discredited in any of the modes recognized by law, must be accepted as true. Frank v. Wright, supra, p. 543; Welch v. Young, supra, p. 440.

On the subject just now under consideration, the learned special judge, who presided at the trial below, charged the jury as follows:

"Another contention, gentlemen, of the defendants is that at the time and place in question this automobile, while owned by the defendant, Phillips & Buttorff Manufacturing Company, was not being used at the time and place upon the business of the defendant, Phillips & Buttorff Manufacturing Company, or in furtherance of its business, but used in the private business of Mr. McQueen, the driver of the automobile. Now, as to that issue, you are to determine from the evidence in the case, I mean the preponderance of the evidence, whether or not the car was being used at the time and place in question on the business of the defendant Manufacturing Company, or in furtherance of its business; and in that connection, I instruct you, gentlemen, that if you find from a preponderance of the evidence that while the car was owned by the Phillips & Buttorff Manufacturing Company under the arrangement claimed here by the defendants, that is, it was bought by the Company and was to be used by the Company for general utility purposes at its foundry, and Mr. McQueen had the right also to use it at times when the Company was not using it, he furnishing the oil and gas and paying for the repairs, and things of that kind, and if you find that the car at the particular time was being used later than the working hours of the foundry, that fact would not preclude the car from being used at the time and place in question upon the business of the Company. In other words, if you should find from the evidence that the understanding or the custom of the use of this car was that it should be kept at any particular place either day or night, and that in the course of that business it was necessary to take the car to and from the foundry and the place where it was kept at night, why then if the car was being returned at the time and place in question to the place where it was usually kept at night, then that would constitute the car being used in furtherance of the defendant's business, or for the defendant's purposes —I mean the defendant Manufacturing Company."

The foregoing excerpt from the charge is made the basis of the sixth assignment of error in this Court.

The undisputed testimony of Mr. Binns (who acted for the Phillips-Buttorff Mfg. Co. in making the aforesaid agreement with McQueen for the purchase and use of the Ford coupe) is that there was no understanding that the car should be kept at any particular place at night, or after the close of business at the foundry (5:30 P. M.). McQueen contracted and paid for the privilege of keeping or using the car wheresoever he pleased at all times between the close of business at the foundry each day until the opening of business at the foundry on the following day.

In the light of the undisputed evidence in the record, we are of the opinion that, at the time of the tragic accident involved in this case, defendant McQueen was not engaged in the business of defendant Phillips-Buttorff Mfg. Co. Although the automobile he was driving was the property of his co-defendant, he was not operating it in the course of the business of the Phillips-Buttorff Mfg. Co. and within the scope of his employment by that Company, but was operating it for his own personal use and on a mission in which the defendant Company had no interest. The doctrine of respondeat superior does not render the owner of an automobile liable for the negligence of the driver unless the owner has the right to control and direct the way and manner in which the driver shall operate the car. Davis v. Auto Tire & Vulcanizing Co., 141 Tenn., 527, 530, 213 S. W., 914; Goodman v. Wilson, supra, 468; Core v. Resha, supra, 416; 3 Cooley on Torts (4 Ed., 1932), sec. 527, p. 531; 2 Blashfield's Ency. of Automobile Law, 1367, 1391; 39 C. J., 1269-1270, sec. 1454.

The motion of defendant Phillips-Buttorff Mfg. Co. for a directed verdict in its favor should have been sustained, for the reason that "at the time of the accident McQueen was not engaged in the business of defendant Company;" and to that extent the second assignment of error is sustained.

It also results from the view we have stated that there was error in that part of the Court's charge which is challenged by the sixth assignment of error, supra, and that assignment is likewise sustained.

Through the first assignment of error it is asserted that the trial court erred in not sustaining the motion made by defendant McQueen for a directed verdict in his favor. In support of this assignment it is insisted that there was no evidence (1) that defendant McQueen was running his car in excess of thirty miles an hour, or (2) was not keeping a proper lookout ahead, or (3) was violating the right-hand curb ordinance.

It is also insisted that the deceased, Mrs. McAlexander, was guilty of contributory negligence which would bar the action of her administrator.

The same propositions are advanced on behalf of defendant Phillips-Buttorff Mfg. Company through the second assignment of error.

Defendant McQueen testified that while he was driving eastward on West End Avenue about 5:45 o'clock P. M. on October 7, 1930, his car struck a lady (who was afterwards identified as Mrs. McAlexander) at a point in West End Avenue opposite the front entrance to the Seminole Apartments; that he had turned into West End Avenue at Twenty-first Avenue and passed a moving westbound street car between Twenty-first and Twentieth Avenues; that the lights were burning on his car and it was equipped with good four-wheel brakes; that his car was running at a speed of from twenty to twenty-five miles an hour—not more than twenty-five miles—and he was keeping a proper lookout ahead; that the westbound traffic was very heavy, but there were few cars going east; that about opposite the entrance to the Seminole Apartments a lady appeared suddenly from behind a westbound automobile, running, or going "in a kind of trot," in a southeasterly direction, with her head down; that when she first appeared within the range of his vision, a few feet to the left of the course his car was traveling, she was "running, slightly angling," with her back to him; that when he saw the lady he at once applied his brakes and "cut" his car to the left in an effort to pass behind her, but failed, and the right front of his car struck her, and her body rolled about twenty feet eastward in front of his car—it being considerably down-grade toward the east at that point; that his car ran about fifteen feet after striking the lady, and stopped four or five feet west of her body; that he immediately got out of his car and, with the assistance of a man who came up at that time, he placed the lady in an automobile and took her to St. Thomas Hospital, and had prompt attention given her there by doctors and nurses, but that she died on the following day.

M. T. Sykes testified that he was driving eastward on West End Avenue in an automobile about thirty or forty feet behind McQueen at the time of the accident in question, and that McQueen was driving at a speed of twenty miles an hour. Sykes also testified that a westbound automobile passed McQueen in front of the Seminole Apartments, and that he (witness) saw it swerve toward the south, as if avoiding an object in the street, about the time it was passing McQueen.

Defendant McQueen testified further that, at the time Mrs. McAlexander appeared near the front of his car in the manner before stated, his "left-hand car wheels" were "about on," or "a fraction north of," the south rail of the inbound street car track, which, the record shows, was, at that point, nineteen feet and eight inches from the south curb line—West End Avenue being fifty-five feet wide between curbs; that, by reason of the fact that he "cut" his car to the left in an effort to avoid the collision, it stopped with the front wheels

between the inbound and outbound street car tracks—with the left front wheel probably closer to the outbound track than to the inbound track; that he found Mrs. McAlexander's body lying between the rails of the inbound track, but partly on the south rail of the inbound track, where it had been thrown or rolled by the force of the impact.

The testimony of three other witnesses for defendants tends to corroborate McQueen as to the position and location of his car when it stopped, the distance Mrs. McAlexander's body was thrown or rolled, and the fact that her body came to rest, and was picked up, between the rails of the inbound street car track.

We have thus briefly summarized the proofs for defendants in order that the issues arising out of the evidence may be better understood, for the evidence on behalf of the plaintiff is much more important on appeal, because of the well settled rule that there can be no constitutional exercise of the power to direct a verdict in a case where there is a dispute as to any material evidence touching the determinative facts of the case, or any legal doubt as to the conclusion to be drawn from the whole evidence upon the issue to be tried, and the equally well settled rule that the findings of a jury upon questions of fact will not be disturbed on appeal if they are supported by any material evidence. In conformity with the rules just stated, we must, in the present case, view the evidence, with respect to disputed facts, in that aspect most favorable to the plaintiffs below of which it is reasonably susceptible, and discard all countervailing evidence.

But it is important to remember that proof of negligence of McQueen, as charged in the declaration, was not sufficient to take the case to the jury and to support the verdict for plaintiff as against either of the defendants, if it appeared from undisputed evidence, susceptible of no other reasonable inference, that Mrs. McAlexander was guilty of negligence which proximately caused or contributed to her injuries and death. Traction Co. v. Brown, 155 Tenn., 323, 331, 89 S. W., 319.

There is no evidence tending to sustain the averment of the declaration that "plaintiff's intestate alighted from an outbound or westbound street car at or near the intersection of Twentieth Avenue North and West End Avenue" shortly before she was injured by defendant's automobile.

Plaintiff's witness, Miss Rawls, testified that she alighted from the front exit of a westbound street car at the east margin of Twentieth Avenue, walked to the rear of the street car, waited until the street car moved on westward, looked to the east and saw that no automobiles were approaching from that direction close enough to "hinder" her crossing, crossed to the sidewalk on the south side of West

End Avenue and walked eastward thereon to the steps leading from the sidewalk to the front yard of the Seminole Apartments, and as she "started to go up the steps, a great crash sounded" behind her; that she "turned around and looked to see" and "fell at the same time;" that the "crash" she heard "sounded" like somebody "slamming brakes on;" that when she " looked into the street," she saw an automobile on the inbound street car track, directly in front of the entrance to the Seminole Apartments, in contact with a woman's body—the body being "in the air;" that she threw her arm up and turned away for a "minute," and then when she "saw it next" the body was on the ground, "in a rolling position," in front of the entrance to the house adjoining the Seminole Apartments on the east, and the automobile had stopped west of the body; that witness picked up Mrs. McAlexander's pocketbook under a parked automobile at the curb a few feet east of the entrance to the Seminole Apartments; and that witness saw skid marks about the length of the car west of the entrance to the Seminole Apartments.

There is evidence that the front entrance to the Seminole Apartments is 110 feet from Twentieth Avenue, and that it is 63 feet from the front entrance of the Seminole Apartments to the front entrance of the next house on the east—No. 1917 West End Avenue.

Miss Rawls testified that she saw no other woman alight from the street car when it stopped at Twentieth Avenue and she alighted therefrom in the manner before stated.

Plaintiff's witness G. D. Freeman testified that he was walking eastward on the north sidewalk of West End Avenue, from which viewpoint he saw the principal facts to which he testified. We quote from the testimony of this witness as follows:

"Q. How far below 20th on West End were you on the north side when anything attracted your attention? A. Oh, I was about I would say about fifty feet, I would guess, fifty or seventy-five, or something like that.

"Q. Were you east or west of 20th? A. I was east of 20th.

"Q. East of 20th? A. Yes, sir.

"Q. Was there anything that attracted your attention? If so, what? A. Well, you see, I heard these brakes go on, and I heard a crash, and when I looked around this lady was in the air, and—

"Q. What kind of a crash was it? Describe the crash. A. It sounded just like a car had hit a big empty goods-box, or something like that, was just the way it sounded.

"Q. You say before that you heard some brakes go on? A. Oh, yes, sir.

"Q. Do you know how long the brakes had been on before you heard that crash? A. Well, the way it sounded, he had them all the way in.

"Q. Sir? A. He put them on, it seemed like it made an awful racket, you know, when he applied his brakes, in a hurry. I couldn't hardly describe it.

"Q. You heard, then, this loud crash? A. Yes, sir.

"Q. So you looked, then? A. Yes, sir.

"Q. What did you see when you looked? A. I saw the lady's body in the air; I couldn't tell what it was until after it had stopped rolling.

"Q. How far did the lady's body travel in the street, or in the air? A. It looked to me like it rolled down the street about fifty or sixty feet.

"Q. Did you see this automobile hit her, or see an automobile there? A. Yes, sir, I saw it.

"Q. How far did the automobile go with reference to where the body stopped? A. It stopped, oh, it stopped as close as from here to there; he was in about five feet of her when he stopped, as far as I could see.

"Q. Do you know whether the automobile stopped east or west of the body, whether the automobile went further than the body, or whether the body went further than the automobile? A. No, the body went further than the automobile.

"Q. How high into the air did this body go? A. Well, I would say about this high, when I saw her. (Witness indicates by holding hand out.)

"Q. About how many feet is that? A. It is about six feet, I should say.

"Q. Sir? A. About six feet.

"Q. You mean that distance you mentioned there, is six feet in the air? A. Well, about that high, I don't know just how high it is.

"Q. Let us get that. Where is there a yardstick? We can stipulate about that. A. I am six feet, myself.

"Q. Well, now, just indicate on your body about how high it was? A. About right along there. (Indicating on body.)

"Q. And you are six feet high, you say? A. Yes, sir.

"Q. Well, it went about four and a half feet, something like that. Now, how far down the street did this body go through the air, before it hit the street? A. Not very far I would say; she didn't go very far.

"Q. Then, did the body roll out? A. Yes, sir, the body rolled out I couldn't say just how far it went.

"Q. After this collision, this loud crash, what about the crying of the brakes then, did the brakes continue to make any noise? A. Well, I couldn't say, because I was watching her, but I wasn't noticing the car, I mean I didn't notice the brakes.

"Q. When you looked out and saw this car, your attention first having been attracted by the crying of the brakes or this crashing, how fast was this automobile going? A. Well, I couldn't say, but judging from the distance she rolled, I would say he was going forty-five miles an hour.

"Mr. Farrell: Wait a minute, unless he saw the car moving, I don't see how that would be competent, for him to say how fast the car was going.

"Mr. Walker: Q. Have you driven automobiles? A. Yes, sir.

"Q. You own an automobile? A. Yes, sir.

"Q. How long have you been driving an automobile? A. About ten or twelve years.

"Q. And have you not only operated automobiles, but had opportunity to observe the speed that a car will make? A. Yes, sir.

"Q. Have you seen automobiles running on West End Avenue, before this particular occasion, along in that neighborhood? A. Yes, sir.

"Q. State to the jury whether or not from Twentieth Avenue and from a point 100 feet or more west of Twentieth Avenue on West End, and leading east down toward Lyle Avenue, is down grade? A. Yes, sir.

"Q. And you say you saw this automobile and this lady's body in the air at the same time? A. Yes, that's right.

"Q. Now, I don't want you to predicate your statement on how far the car went and the noise or sound of the crash, or screeching of the brakes, because the jury can decide that as well as you, but from what you saw of the automobile itself there, as it was running along, from your knowledge of the speed of automobiles on previous occasions, and your knowledge of the operation of automobiles, how fast do you say this car was running?

"Mr. Farrell: Wait a minute. I have not understood the witness to say he saw the car before it struck the body; he said the brakes were what attracted his attention.

"Mr. Walker: He said he looked around and saw the automobile and the woman at the same time, and saw the woman's body in the air.

"Q. Is that what you say? A. That's right.

"Mr. Farrell: I understood him to say the first thing that attracted his attention was the application of the brakes.

"Mr. Walker: Q. Just go ahead and state from what you saw of the car then your honest opinion of how fast that car was moving? A. My honest opinion is forty-five miles an hour.

"Mr. Farrell: We object to that, on the ground that the witness never saw the car moving.

"Mr. Hatcher: He did see it moving; he saw it run fifty feet.

"Mr. Walker: Q. It certainly was not standing if that woman's body was in the air and rolled down fifty feet? A. No, sir, it was not standing.

"Q. Was the car moving? A. Going east.

"Q. Did you see it? A. Yes, sir.

"Q. How far was the automobile from you, how many feet? You stated that you were on the north side of the street, and that you heard this crash; which way did you look when you heard this crash? A. I looked south.

"Q. South? A. Yes, sir.

"Q. You looked across the street, is that true? A. Yes, sir.

"Q. How many feet would you say you were from this car? You were just the width of the street at that time, is that correct? A. Right across the street, I as on one side of the street I was on the south side of the street walking along, you see, and it passed directly across from me.

"Q. You said you were on the south side of the street? A. I meant on the north side.

"Q. You were on the north side? A. Yes, sir. I was on this side.

"Q. Whereabouts in the street was this woman's body when you saw this automobile and heard this crash, whereabouts in the street with reference to whether it was on the north side, the middle of the street, or car tracks, or the south side, or where was it? A. Well, it was about between the car tracks. You see there is a space between the car tracks, so they can pass, of course. There is where she was when they picked her up."

On cross-examination, the witness Freeman testified further with reference to the manner in which he formed his estimate of the speed of defendant's automobile, as follows:

"Q. And you didn't see this automobile, and the only thing that made you turn around was the application of the brakes, wasn't it? A. That's right.

"Q. Up to that time you hadn't looked at all, to see how fast the automobile was running, had you? A. No, sir.

"Q. And the automobile, when you looked then, had its brakes squeaking? A. Yes, sir.

"Q. Because that is what made you look, and yet you tell this jury that that automobile, with the brakes on and screeching, was running forty or fifty miles an hour? A. I was judging from the distance she rolled and the application of the brakes.

"Q. I am asking you now to answer my question, you said the first thing that made you look around was the squeaking of the brakes, didn't you? A. That's right.

"Q. Then you looked, and you saw the automobile in collision with the woman's body; then you saw the automobile at the time you looked and saw it, because you had not seen it before that, was running forty or fifty miles an hour, is that right? A. I didn't say he was going—

"Q. How fast did you say he was going, if you didn't say so, how fast do you now say it was going? A. I was judging from the distance it knocked her, and the way he put on the brake, it was possibly going that fast. When I saw the lady, her body was in the air.

"Q. And then if the body was not knocked forty or fifty feet, that would tend to destroy your idea, or your guess, relative to how fast he was going, as you did not see the car moving? A. I would judge that from the application of the brakes and my experience in driving myself.

"Q. Well, does the application of the brakes, and the noise that the brakes make, can you tell from that how fast a car is going? A. I could estimate it, I would have an idea.

"Q. That whole thing that you are giving to the jury, then, is just a guess on your part, isn't it? A. No, sir, I wouldn't say how fast; I didn't say how fast it was, because I couldn't tell.

"Q. But you do say that you never saw the car before you heard the noise of the brakes being put on? A. That's right.

"Q. You hadn't looked at it before that time, because your back was towards it, that's right, isn't it? A. Well, it was to my right.

"Q. I say you hadn't looked at it before you heard the noise of the brake? A. No, sir, I didn't have any reason to.

"Q. So, when you looked at the car, the brakes were being applied, and applied strongly, weren't they? A. Yes, sir.

"Q. And yet you tell this jury that when you looked and saw the car it was running forty or fifty miles an hour, with the brakes on? A. No, sir; I didn't say that; I said judging from the distance.

"Q. Then you don't know how fast the car was going just before he put the brakes on, do you? A. No, sir.

"Q. How fast was it going when you saw it after the brakes had been put on? A. I couldn't say."

Freeman also testified that McQueen's car was between the inbound and outbound street car tracks at the time of the collision.

The proof shows that Mrs. McAlexander was wearing "a black dress and light hose" at the time she was injured. The condition of her clothing and the external appearance of the injuries to her body (as reflecting upon the force of the collision) are described in the testimony of defendants' witness W. M. Ewing, a Tennessee State Highway Patrolman (who arrived at the place of the accident just as McQueen was alighting from his car), as follows:

"Q. Could you see any blood? A. Yes, sir, I saw plenty of blood right there under her head.

"Q. Did you see any blood west of where you saw the body? A. No, sir, I didn't notice any.

"Q. Was the lady's clothes torn? A. Yes, sir.

"Q. Badly torn? A. Yes, sir, they were badly torn.

"Q. Where did she have any wounds on her body or head? A. Her hair was torn nearly off, and her mouth was cut up, and she had quite a few cuts all over her head.

"Q. Her head was full of blood? A. Yes, sir.

"Q. And there were severe cuts on both temples? A. Yes, sir.

"Q. And on her neck? A. Her hair was torn very bad.

"Q. Her hair was torn nearly off, wasn't it? A. Yes, sir."

Accepting the testimony of the plaintiff's witnesses as the truth of the case, plaintiff's intestate was thrown or rolled by the force of the impact of defendants' automobile for a distance of more than sixty-three feet, and defendants' car ran almost that distance after the collision, with its brakes set to the extent of their capacity, before it stopped. These facts, together with the nature of the injuries to Mrs. McAlexander's body and her clothing, were circumstances which the jury could consider in determining whether or not defendant McQueen was running his car in excess of thirty miles an hour at the time Mrs. McAlexander appeared in front of it. A similar situation was presented in the case of Elmore v. Thompson, 14 Tenn. App., 78, (opinion by this Court July 2, 1931, and certiorari denied by the Supreme Court January 23, 1932), and it was there said:

"Direct testimony is not essential to warrant a finding of excessive speed. Evidence as to the force of the impact of a collision, or as to the distance which an automobile causing an injury overshot the point of the accident before being brought

to a standstill, is of significance, and may be, by itself, or in connection with other circumstances, of sufficient force to warrant a jury in finding negligence as to speed, and in drawing an inference that the machine was traveling at a rate of speed such as to endanger the life or limb of persons upon the highway. 2 Blashfield's Cyclopedia of Automobile Law, 1733-1737, and numerous illustrative cases there digested. See also pages 1698-1703 in same volume, and 1 Berry on Automobiles (6 Ed.), sec. 433 (at bottom of page 372); Collins v. Desmond, 1 Tenn. App., 54, 60; Bombard v. Newton (Vt.), 111 Atl., 510, 11 A. L. R., 1402; Sullivan v. Chauvenet, 222 S. W., 759, 761, 282 Mo., 649; Kennedy v. Bruce, 5 Tenn. App., 583, 585.''

We therefore conclude, as in Elmore v. Thompson, supra, that there was evidence to take the case to the jury for a finding as to whether the automobile which struck Mrs. McAlexander was then and there being driven at a rate of speed which violated the aforesaid city ordinance limiting the maximum speed of vehicles to thirty miles an hour.

The ordinance known in the record now before us as "the Right-hand Curb Ordinance" was also construed and applied in Elmore v. Thompson, supra. Concerning that Ordinance, it was there said:

"The inquiry is, whether there was evidence that, at the time defendant's car struck plaintiff, it was being operated in violation of the aforementioned City Ordinance requiring that 'a vehicle, except when passing a vehicle ahead, shall keep as near the right-hand curb as possible.'

"The City Ordinance above quoted was manifestly designed for the protection of travelers upon the streets of the City of Nashville, and if defendants violated it they were guilty of negligence per se. Hines v. Partridge, 144 Tenn., 219, 229, 231 S. W., 16; Power Packing Co. v. Borum, 8 Tenn. App., 162, 166; Kennedy v. Bruce, 5 Tenn. App., 583, 585.

"In the Indiana case of Bennighof-Nolan Co. v. Adcock, 29 A. L. R., 1344, the Court expressed a doubt of the reasonableness (and therefore of the validity) of a City Ordinance in terms substantially the same as that here involved.

But the Supreme Court of Missouri, in the case of Smith v. Mederacke, 259 S. W., 83, upheld an ordinance couched in the exact language of the ordinance of the City of Nashville here under consideration, holding that the ordinance should be construed as a requirement that vehicles must keep as near the right-hand curb as reasonably or practicably possible, and also holding that said ordinance was passed for the protection of pedestrians (so that they would know where to watch out for vehicles) as well as for persons traveling in vehicles. Smith v. Mederacke,

supra, seems to be the leading case on this subject. See 1 Blashfield's Cyclopedia of Automobile Law, 528.

"In Power Packing Co. v. Borum, supra, a judgment of the Circuit Court, based on the verdict of a jury, in favor of Borum, was affirmed by this Court, and certiorari was denied by the Supreme Court. In that case, one of the acts of negligence averred in the declaration, and on which the verdict and judgment were based, was the violation by the defendant's truckdriver of the same ordinance of the City of Nashville which we are now considering.

"The validity of said ordinance has been questioned in the instant case. We agree with the Missouri Court, supra, that the ordinance in question should be construed as requiring vehicles to keep as near the right-hand curb as reasonably or practicably possible, and that it was intended for the protection of pedestrians as well as vehicular traffic."

In the present case, defendant McQueen was, according to plaintiff's proof, driving at least twenty feet from the "right-hand curb" as he approached and struck Mrs. McAlexander. Some automobiles were parked alongside the right-hand curb in front of the Seminole Apartments, but, making an allowance of six or seven feet for the space occupied by these parked cars, it could not, in our opinion, be held as a matter of law that defendant McQueen was driving his car as near the right-hand curb as was reasonably or practicably possible, at the time and place here under investigation, and it was, therefore, proper to submit that question to the jury; or at any rate defendant McQueen cannot complain of its submission to the jury, for the Court thereby put it in the power of the jury to decide in favor of defendants a question which, we are inclined to think, the Court might have held against the defendants upon the testimony of defendant McQueen, who admitted that his car was running astride the south rail of the inbound car track at the time Mrs. McAlexander appeared in front of him. Bolin v. State, 9 Lea, 516, 519.

Defendant McQueen testified that he was keeping a proper lookout ahead, and there is no evidence to the contrary; but to "keep a proper lookout ahead" will not relieve an automobile driver from liability for the consequences of his negligence in driving at an unlawful rate of speed, and in violating the ordinance requiring him to drive as near the right-hand curb as reasonably possible.

But if defendant McQueen was guilty of negligence which was a proximate cause of the injuries and death of plaintiff's intestate, plaintiff is not entitled to recover if his intestate was also guilty of negligence which proximately caused or contributed to her fatal injuries and death. Traction Co. v. Brown, supra.

Defendants insist that plaintiff's intestate was violating section 14 of the Traffic Ordinance of the City of Nashville, which provides that pedestrians "must not cross the streets except at street crossings." Section 14 thus invoked by defendants is in evidence, and reads as follows:

"Sec. 14. Be it further enacted that pedestrians shall not step from the sidewalk to the roadway without first looking to see what is approaching, and shall not needlessly interfere with the passage of vehicles or street cars. Persons waiting for street cars shall not step from the sidewalk to the right of way until the street car approaches. While the roadbed of streets and highways are primarily intended for vehicles, pedestrians have a right to cross them in safety, and pedestrians in their turn must not cross the streets except at street crossings, and shall cross the streets as near as possible at right angles, and not diagonally. This provision, however, shall not excuse the driver of any vehicle from constant vigilance to avoid injury to pedestrians under all conditions or through his own carelessness."

The record affords no explanation of the presence of Mrs. McAlexander near the middle of West End Avenue and approximately 100 feet from the nearest street crossing, at the time she was discovered by defendant McQueen. Whence she came or how she reached that point are facts not disclosed by any direct evidence in the record, but, in disposing of the motion for a new trial, the learned trial judge said that "it seems that this lady, by the fair inferences from the proof, had come from the north side of the street, and was going over to her residence or apartment in the Seminole Apartments."

Upon the hypothesis just stated, the learned trial judge (as appears from his written memorandum) ruled as follows:

"The evidence in this case, with reasonable inferences therefrom, and the surrounding conditions and circumstances of the occurrence, do not preclude the presumption of due care on the part of the deceased for her own safety, and tend to show that the injury could have been avoided but for the negligence of defendant McQueen.

"The Court therefore holds that deceased's violation of Section 14 of City of Nashville Ordinance No. 385 does not deprive her of the presumption of having exercised due care for her own safety in the undertaking, which although unlawful, may have been done in a careful manner, by proper looking, listening, etc.

"With the indulgence of such presumption, the jury was warranted in the finding or conclusion that the negligence of the driver of the automobile in question was the proximate cause of deceased's injury and death."

We do not concur in the view of the learned trial judge that "the evidence in this case, with reasonable inferences therefrom, and the surrounding conditions and circumstances of the occurrence, do not preclude the presumption of due care on the part of the deceased for her own safety."

The presumption of due care, arising out of the natural instinct of self-preservation, has application only in the absence of evidence, either direct or circumstantial, tending to show the circumstances surrounding the deceased at the time the injury was received or as to how the accident occurred, and disappears when such evidence is produced. Tennessee Central Railway Co. v. Melvin, 5 Tenn. App., 85, 98, and authorities there cited.

The undisputed evidence shows that Mrs. McAlexander was disobeying the mandate of section 14 of the Traffic Ordinance, supra, which forbade pedestrians to cross the street except at street crossings, and she was, therefore, guilty of negligence per se. Hines v. Partridge, 144 Tenn., 219, 229, 231 S. W., 16; Elmore v. Thompson, supra. This is inconsistent with and necessarily destroys the presumption that she was in the exercise of due care.

But, in order to defeat plaintiff's recovery, the negligence of his decedent must have not only contributed to her injuries, but it must have contributed thereto as a proximate cause thereof, and not as a remote cause or mere condition. Elmore v. Thompson, supra; Black v. Moree, 135 Tenn., 73, 84, 185 S. W., 682; N. C. & St. L. Railway v. White, 158 Tenn., 407, 420, 15 S. W. (2d), 1; Hull v. Simmons, 7 Hig., 351, 357; Armstead v. Lounsberry, 129 Minn., 34, 151 N. W., 542, L. R. A., 1915D, 628, 631; 2 Blashfield's Cyclopedia of Automobile Law, pp. 1183-1184, 1194, 1209, 1212-1214; 20 R. C. L., p. 121; Lindsay v. Cecchi (Del.), 35 L. R. A. (N. S.), 699; Note, 55 Am. D., 674; Note, 36 Am. St. R., 818.

It will be observed that while pedestrians are forbidden by section 14 of the Nashville Traffic Ordinances, supra, "to cross the streets except at street crossings," this prohibition is followed by the proviso that its violation by a pedestrian "shall not excuse the driver of any vehicle from constant vigilance to avoid injury to pedestrians under all conditions or from his own carelessness." The proviso just quoted seems to be merely declaratory of the general law; that is to say, an ordinance forbidding pedestrians to cross the street except at street intersections does not relieve the driver of an automobile from liability for injuring a pedestrian violating the ordinance, if the carelessness of the automobilist was the proximate cause of the injury to the pedestrian and the negligent act of the pedestrian was only a remote cause. Ivy v. Marx (Ala.), 14 A. L. R., 1173; Blash-

field, supra, pp. 1160-1161; 1 Berry on Automobiles (6 Ed.), sec. 355: 42 C. J., p. 1038, sec. 785.

"The proximate cause of an injury may, in general, be stated to be that act or omission which immediately causes or fails to prevent the injury; an act or omission occurring or concurring with another, which, had it not happened, the injury would not have been inflicted." Deming & Co. v. Merchants Cotton Press, etc., Co., 90 Tenn., 306, 353, 17 S. W., 89, 13 L. R. A., 1518.

But the "proximate cause is not necessarily that which is next or last in time or place, but that which is a procuring, efficient, and predominant cause. Closeness in causal relation, rather, is the meaning." Grigsby & Co. v. Bratton, 128 Tenn., 597, 603, 163 S. W., 804.

The "remote cause" of an injury is "that which may have happened and yet no injury have occurred, notwithstanding that no injury could have occurred if it had not happened." Anderson v. B. & O. Railroad Co. (West Va.), 51 L. R. A. (N. S.), 888, 892; Note, 36 Am. St. R., p. 809.

Even though plaintiff's intestate had been forbidden by municipal ordinance to cross the street at the place where she was injured, it was the duty of defendant McQueen to drive his automobile as near the south curb of West End Avenue as reasonably possible or practicable under the then existing circumstances, and also to refrain from driving at a speed of more than thirty miles an hour.

"There is a distinction between an unlawful or wrongful act which is at least a contributing cause of the injury sued for, and one which is merely an attendant circumstance or condition, though perhaps a necessary condition of the acts resulting in such injury. An event may be one without which a particular injury would not have occurred; yet, if it was merely the condition or occasion affording opportunity for other events to produce the injury, it is not the proximate cause thereof." Blashfield, supra, p. 1194.

Although it may be otherwise in a case where the facts are undisputed and are susceptible of but one inference, it is the general rule that what is the proximate cause of an injury is ordinarily a question for the jury. "It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it." 22 R. C. L., p. 148, sec. 31, and cases there cited in footnote 8.

It follows from what we have said that the first assignment of error is overruled, and, insofar as the second assignment asserts that the trial court should have sustained the motion of the Phillips-Buttorff Manufacturing Company for a directed verdict on the grounds stated in the first assignment of error, the second assignment is also sustained.

The third assignment is to the effect that the trial court erred in not holding that there was a variance between the allegations of the declaration and the proof, in that, the declaration averred that the plaintiff's intestate alighted from an outbound street car at or near the intersection of Twentieth Avenue North and West End Avenue and crossed over from the point where she alighted to the south side of West End Avenue, and that the averments of the declaration just stated were not proved.

This was not a material "variance," but merely a failure of the plaintiff to prove a non-essential or non-determinative fact. The third assignment of error is overruled.

The fourth assignment is that the trial court erred in charging the jury as follows:

"It is the duty of persons who drive automobiles on the highways or streets to drive them in the exercise of ordinary care, and operate them in that way; it is their duty to be vigilant and on the lookout to see those things and objects that ought to be seen, and when they see danger, to do the prudent thing in order to avoid injury to persons upon the highway. It is their duty to have their cars equipped as an ordinarily prudent person would have his car equipped, and if an ordinarily prudent person would have horns or whistles, or any other devices, it would be the duty of a person operating a car to have horns and whistles and other such devices; it would be his duty to operate his car with his brakes in a reasonably safe condition, so that if he was confronted with a situation that the prudent thing to do would be to stop, that he could stop as a reasonably prudent person would under the circumstances; and it is also the duty of the operator of an automobile upon the streets and highways, and especially upon a city street, at the time and place in question, to not exceed a speed of thirty miles per hour, and to have his automobile under such reasonable control as that he can stop it and prevent injuries that might arise in the course of his travel."

The criticism offered to the above excerpt from the charge is that "it made the operator of the car practically an insurer against accidents and placed an absolute duty upon him to so drive it as that he 'could stop it and prevent injuries that might arise in the course of his travel.'"

This is, we think, hypercritical. An automobile is "under control," within the meaning of the law, when it is moving at such a rate of speed (not in excess of legal speed limits), and the mechanism and power are under such control, that it can be brought to a stop with a reasonable degree of quickness under all the circumstances.

1 Blashfield, supra, p. 323. No greater duty than that just stated was imposed upon the defendant by the charge quoted in the fourth assignment of error, and that assignment is overruled.

The fifth assignment is that the trial court erred in charging the jury (after undertaking to state the theory of the defendants) a follows:

> "Now, gentlemen, if you find that theory or contention to be true, by a preponderance of the evidence, or if it is not disproven by a preponderance of the evidence, you would find in favor of the defendants."

We find no error in the instruction just quoted. Of course, it was the duty of the jury to find in favor of defendants if the defendants' theory or contention was supported by a preponderance of the evidence; but the trial court placed the burden on the plaintiff to disprove the defendants' theory or contention by the preponderance of the evidence before the plaintiff could recover. The fifth assignment of error is overruled.

We have heretofore disposed of the sixth assignment of error.

The seventh assignment is that the Court erred in charging the jury as follows:

> "Now, gentlemen, referring further to the contention, or rather to the count here embracing what is known as the right hand curb ordinance, as set forth in count No. 3 of this declaration, that is, that a vehicle except when passing a vehicle ahead shall keep as near to the right hand curb as possible, you are instructed that this ordinance is for the protection of vehicles moving in the street, and has no application to this case except if you find from the preponderance of the evidence in the case that its observance by the driver of the automobile in question was relied on by Mrs. McAlexander at the time and place in question, the law being that in the exercise of ordinary care she had the right to rely on its observance unless and until she saw or knew, or in the exercise of ordinary care, she should have seen or known that it was not being observed. In other words, this ordinance is material to this case only upon the issue of the care exercised, or the negligence committed by Mrs. McAlexander at the time and place in question."

As we have heretofore ruled in our consideration of the first assignment of error, the "right-hand curb ordinance" was intended for the protection of pedestrians as well as vehicular traffic, and the excerpt from the charge quoted in the seventh assignment, supra, was erroneous, in that, it limited said ordinance to the protection of vehicles moving in the street; but this error in the charge was distinctly favorable to the defendants, and, therefore, they cannot complain on that score. 2 R. C. L., pp. 237-238, sec. 197; Railroad v.

Hatch, 116 Tenn., 580, 590, 94 S. W., 671. The seventh assignment of error is overruled.

The eighth assignment is that the Court erred in charging the jury as follows:

"But if you find for the plaintiff, you should go further, and assess the damages. In doing this, you will take into consideration the nature and extent of the injury, the value, I mean the pecuniary value of the life of the deceased, Mrs. McAlexander, her earning power, any loss, if any, of services and companionship to Mr. McAlexander as her husband; as to pain and suffering, it appears from the proof, the uncontroverted proof, as I understand it, that Mrs. McAlexander never regained consciousness after she was struck. In that situation you could not properly allow anything for pain and suffering that she underwent. Now, the pecuniary value of the life of the deceased is based upon her habits, her age, condition of health, capacity for earning money in the pursuit of her calling, and her expectancy of life. After weighing all of these elements, you should assess such damages as would be reasonably sufficient to compensate for the loss of such a life."

It is said that it was error to instruct the jury that, in assessing the damages allowable in the event they should find for the plaintiff, they should take into consideration (1) "the nature and extent of the injury," and (2) the "companionship" of the deceased wife to her husband.

The first of these two statements was doubtless a mere inadvertence of the learned trial judge which he would have readily corrected if it had been promptly called to his attention, as it should have been if observed by counsel. Carney v. Cook, 158 Tenn., 333, 340, 13 S. W. (2d), 332.

In view of the clear and unequivocal instruction that, as Mrs. McAlexander "never regained consciousness after she was struck," the jury "could not properly allow anything for pain and suffering that she underwent," we do not think that there is any reasonable probability that the amount of the verdict was increased by the aforesaid reference in the charge to "the nature and extent of the injury," and such reference was, therefore, harmless. Carney v. Cook, supra.

The instruction that the jury might take into consideration, as an element of damages, the "companionship" of the deceased wife "to Mr. McAlexander as her husband," presents a question of some difficulty.

It was error to so instruct the jury, for in cases of this character, "nothing can be allowed as solatium, that is, for the loss of the moral aid, comfort, counsel and companionship of the deceased." Davidson-

Benedict Co. v. Severson, 109 Tenn., 572, 633, 72 S. W., 967; Railway & Light Co. v. Davis, 3 Hig., 522, 529; Hines v. Partridge, 144 Tenn., 219, 238, 231 S. W., 16.

However, if it was "clear from the size of the verdict that the jury did not award more than fair compensation for the actual pecuniary loss sustained," and that "the verdict did not indicate that the jury allowed any damages as solatium," such error would not be reversible. International Corporation v. Wood, 8 Hig., 10, 28.

But the proof showed that Mr. and Mrs. McAlexander had been married about three years; that they maintained a home in the Seminole Apartments, and the record indicates, without a suggestion to the contrary, that their relations were in all respects agreeable and their home life a happy one. Mrs. McAlexander was a healthy, active, intelligent, educated woman, thirty-three years of age, and the reasonable inference to be drawn from the undisputed evidence is that her disposition, temperament, character and attainments were such as to constitute her an ideal companion for a normal business man of Mr. McAlexander's type, as he appears from this record.

In the light of the proof which we have thus briefly summarized, and the amount of the verdict rendered, we are not prepared to believe that the jury did not intend to include in the verdict any damages for Mr. McAlexander's loss of the "companionship" of his wife, when the jury were plainly instructed by the trial judge that it was their duty to assess such damages.

However, errors in the Court's charge relating to the measure of damages may sometimes be cured by remittitur. Railroad v. Johnson, 7 Hig., 458, 471; Railway v. Overcast, 3 Hig., 235, 244; Railroad v. Martin, 113 Tenn., 266, 280, 87 S. W., 418; Baskin & Cole v. Whitson, 8 Tenn. App., 578, 590. And we will defer the further consideration of the eighth assignment of error until we come to the consideration of the last assignment (the eleventh) through which defendants' insist that the verdict was excessive.

The ninth assignment is that the trial court erred in refusing to charge defendants' request No. 3 as follows:

"I charge you that if you find that Mrs. McAlexander was crossing West End Avenue at other than a regular crossing and at a time and under circumstances which constituted proximate contributory negligence on her part and her negligence continued until the time she was struck, then the defendants would not be liable, even though they were negligent, unless you find that Mr. McQueen actually saw Mrs. McAlexander in time to have avoided striking her. Under such circumstances the fact that McQueen might have seen her would not make him liable, you

would have to find that he actually saw her in time to have avoided striking her."

Defendant McQueen testified that he was on the lookout ahead of his car, but that he did not see Mrs. McAlexander in time to avoid the collision, and there was no evidence to the contrary, and no circumstances from which the jury could have inferred that "he actually saw her in time to have avoided striking her." There was no basis in the evidence for the application of the "last clear chance" doctrine, and the trial judge did not err in refusing the request last above quoted. The jury was not instructed that if McQueen might have seen Mrs. McAlexander in time to avoid striking her, he, or the defendants, would be liable; but were instructed that, "if you find negligence on the part of Mrs. McAlexander, and that the same proximately contributed to this accident, even though but in part, then the plaintiff cannot recover. This is true whether the defendant was or was not guilty of negligence." The ninth assignment of error is overruled.

The tenth assignment is for "error of the Court in allowing counsel for plaintiff to cross-examine Mr. Binns, over objection, as to whether he carried fire and theft insurance and 'things like that' (R. 148, 151, 154) on the car. The Court held this competent on the issue of ownership (R. 148), when it had already been stipulated that the car was registered by Phillips-Buttorff Manufacturing Company as owner (R. 136). The purpose of this line of interrogation was self-evident and was extremely prejudicial. This line of inquiry was allowed to be pursued until Mr. Binns finally stated that the Company carried insurance on the car 'to protect ourselves in case of accident' (R. 151)."

The assignment just quoted may be subject to criticism for failure to conform to the rule of this Court with respect to assignments of error, which requires that "when the error alleged is to the admission or rejection of evidence, the specification shall quote the full substance of the evidence admitted or rejected, with citation of record where the evidence and ruling may be found."

But, assuming that the rule just mentioned is inapplicable here for the reason that the assignment purports to challenge an entire "line of testimony," we have examined the testimony challenged by the tenth assignment of error, and we find, as pointed out and insisted in the brief for plaintiff, that there was no exception to its admission. The only record of anything indicating so much as a question of the competency of this evidence is contained in an excerpt from the testimony of D. W. Binns, as follows:

"Q. You took out some thief insurance, did you not? A. We have a blanket policy on all.

"Mr. Farrell: Your Honor, do you think that is competent?

"Mr. Walker: On ownership.

"The Court: Yes, I think it is, gentlemen, on the circumstance of ownership.

"Mr. Walker: Q. And you took out fire insurance on this car, did you not? A. Yes, sir.

"Q. And that was issued in the name of the Phillips & Buttorff Manufacturing Company? A. Yes, sir."

It is true that it had been previously stipulated that the automobile in question was registered with the County Court Clerk of Davidson County, Tennessee, for the year of 1930, in the name of Phillips-Buttorff Manufacturing Company, which registration created a presumption of "ownership" in said Company, but this did not preclude either party from introducing other evidence touching the question of the "ownership" of the automobile, for such presumption was rebuttable.

Moreover, there was (apart from the matter of title) an issue as to the right of possession and control of the automobile during each night and certain specified hours of the day, by reason of the agreement whereby defendant McQueen was to maintain the car, and we think the questions asked Mr. Binns with respect to fire and theft insurance were within the scope of legitimate cross-examination bearing on that issue. The tenth assignment of error is overruled.

The eleventh assignment is that "the verdict of $12,500 was excessive."

It is said, on behalf of plaintiff, that the eleventh assignment, supra, is "void, and one which will not be considered by this Court," and that "the only assignment of error which can be made in an appellate court upon the amount of the verdict of the jury is, that the verdict of the jury is so excessive as to indicate passion, prejudice or caprice."

The view thus stated was held by the Court of Civil Appeals (Brewing Co. v. Ralston, 8 Hig., 584, 595; News Publishing Co. v. Burger, 2 Hig., 179, 183), and was formerly entertained by a majority of the Middle Section of this Court; but in the recent case of Casenburg v. Lewis, Admr. (July 20, 1931), 163 Tenn., 163, 172, 40 S. W. (2d), 1038, an action for negligence involving unliquidated damages, the Supreme Court exercised the right to suggest a remittitur, as an alternative of reversal and remand, merely because the verdict was "excessive."

It had been previously held in the case of Grant v. Railroad (1913), 129 Tenn., 398, 406, 165 S. W., 963, that the power of the trial court to suggest a remittitur, in a case of tort involving unliquidated damages, may be exercised where the verdict is merely excessive, and is

not limited to cases where passion, prejudice or caprice on the part of the jury appears.

On behalf of the defendants, it is said, in support of the eleventh assignment of error, that, "not only did the Court charge the jury to consider, as elements of recovery, matters which they could not consider (as set forth in assignment of error No. 8), but it is evident the jury gave little, if any, heed to Mrs. McAlexander's negligence, if it was only remote."

With respect to remote contributory negligence of Mrs. McAlexander, the trial court, in his principal charge, instructed the jury that, "in case you find that Mrs. McAlexander was guilty of some negligence, but that this negligence did not directly or proximately contribute to the injury, this fact alone would not defeat a recovery altogether, but it must be taken into consideration by you and a proper deduction must be made from the amount of damages you would otherwise allow."

And again, at the request of the defendants, the trial court charged the jury that, "if the defendant was negligent and Mrs. McAlexander was negligent, but her negligence only remotely contributed to the accident, then I charge you this remote contributory negligence of hers must be considered by you in reduction of the damages which you would otherwise be inclined to allow."

In disposing of the motion for a new trial, the trial judge said, among other things, the following:

"From the amount of the verdict, $12,500, it seems that the jury has made proper deduction for any remote contributory negligence of the deceased in the occurrence."

It is thus seen that the trial judge considered the matter of remote contributory negligence of Mrs. McAlexander in its relation to the amount of the verdict, and, in view of the clear and accurate charge to the jury on the subject, it is a reasonable assumption that the jury likewise gave that subject proper consideration, and we are not disposed to hold to the contrary.

But the learned trial judge also held, in disposing of the motion for a new trial, that "no error prejudicial to the defendants appears in the charge and instructions to the jury," although the instruction that the jury should take into consideration, as an element of damages, the "companionship" of the deceased wife "to Mr. McAlexander as her husband" was assigned as error in the motion for a new trial below.

The instruction last above mentioned was erroneous, as we have heretofore pointed out in our discussion of the eighth assignment of error, supra, and we are of the opinion that the consideration by the jury of the value of the "companionship" of the deceased to her

husband, upon the proof in the record bearing upon that subject, must have swelled the amount of the verdict substantially, and we are not inclined to affirm the judgment against defendant McQueen without a reduction of the damages. A remittitur of $2,500, is, therefore, suggested, and if it is accepted by the plaintiff, the judgment against defendant McQueen will be affirmed, and judgment will be entered here for $10,000, and for the costs of the cause accrued in the Circuit Court, except the costs incident to making the Phillips-Buttorff Manufacturing Company a defendant below.

The judgment against the defendant Phillips-Buttorff Manufacturing Company, is reversed, and the suit, as against it, is dismissed.

The costs of the Circuit Court incident to making the Phillips-Buttorff Manufacturing Company a party-defendant, and also one-half of the costs of the appeal, will be adjudged against the plaintiff administrator and the surety on his prosecution bond below.

The remaining one-half of the costs of the appeal will be adjudged against defendant McQueen and the surety on his appeal bond.

Crownover and DeWitt, JJ., concur.